COMMITTEE ON PROFESSIONAL ETH-
ICS AND CONDUCT OF THE IOWA
STATE BAR ASSOCIATION, Complain-
ant,

v.

James W. RAMEY, Respondent.

No. 93–1245.

Supreme Court of Iowa.

Feb. 23, 1994.

Norman G. Bastemeyer and Charles L.
Harrington, Des Moines, for complainant.

Mark Godwin, Des Moines, for respondent.

HARRIS, Justice.

The allegations in this attorney disci-
plinary case are extremely serious. Al-
though issue is also joined on a serious claim
of nondisclosure, by far the more critical
charge involved a courtroom statement, per-
sonally attested by counsel, that proved to be
false. Respondent, an experienced prosecu-
tor in the Polk County attorney's office, was
confronted with a chain-of-custody problem
during the trial of a criminal case. He stated
he had personally examined a serialized list
of monies and could guarantee they matched
up. They did not match up so that the
statement was false.

I. The crucial question is whether the
false statement was: (1) deliberately mis-
leading so as to call for disbarment; (2) made
in reckless disregard of the true facts so as
to call for not less than license suspension;
or (3) negligently made during the confused
heat of trial. The commission concluded that
the case fell somewhere between the second
situation and the third. A majority (three
commission members) found in accordance
with the second alternative and recom-
mended a suspension of not less than three
months. A minority (two commission mem-
bers) found in accordance with the third al-
ternative and recommended a reprimand.
On our de novo review we are however con-
vinced that the case falls somewhere between
the first situation and the second; the seri-
ous concern is whether the license should be
revoked or suspended.

Absolute integrity is so fundamentally cru-
cial to the role of an attorney that there is an
initial reluctance to even consider explana-
tions under these circumstances. We have
nevertheless become convinced that the re-
spondent made a terrible mistake in a grave
matter. He appears at first blush more cul-
pable than he really is. We accordingly
agree with the recommendation for a suspen-
sion.

James W. Ramey, the respondent-attor-
ney, has been licensed since 1975. After two
years in private practice he began an extend-
ed career as a prosecutor. Although he
worked for a time in the office of Iowa's
attorney general, he has served mainly as a
prosecutor in the office of the Polk County

attorney. He is now chief of the major offenses bureau.

Ramey's present difficulty is rooted in the execution of a search warrant at the Des Moines residence of Ernie Draper and Marilyn Wilson. Ronald White and Dennis Sorenson, police officers executing on the warrant, seized property that included currency. On April 25, 1991, during trial of Draper and Wilson on controlled substance charges, it was discovered that currency then being offered into evidence by the State did not entirely match the currency seized at the residence, as shown by photographs taken at the time. A $100 bill with its serial number clearly visible in the photograph was not among the $1000 seized from the bedroom of the residence. It was also discovered that a fifty dollar winning lottery ticket shown in the photographs was missing. It was learned that the wife of officer White had redeemed it. A mistrial was declared.

Another result of the missing items was that the presiding judge released the exhibits to officials so that the remaining currency was inventoried and the serial numbers were recorded. This inventory became the beginning point in the chain-of-custody problem that developed later. A second discrepancy, the one involved in this proceeding, developed the following day. Identification technicians unsuccessfully checked the bills for fingerprints and also compared the serial numbers on the inventory with those appearing on the bills. There were discrepancies. One fifty dollar bill was listed twice and three existing bills (two twenty dollar bills and one ten dollar bill) were not listed. The discrepancies were documented.

During a resulting internal police investigation White denied knowledge of any missing property. When shown the lottery ticket and signature, White's wife admitted to officers that she cashed the ticket. She told them she found the ticket on her porch. White was charged with third-degree theft.

Ramey prosecuted the White case. The trial atmosphere was highly charged, greatly more so than usual even in a high profile case such as the White case. The case excited considerable news attention and was subject to expanded media coverage. Ramey

perceived that he faced an unusual level of hostility in undertaking the prosecution. White was represented by attorneys Alfredo Parrish and Maggi Moss. Moss was a former bureau chief in the Polk County attorney's office. She had been discharged in 1990, following an election defeat of the former county attorney. While a bureau chief, Moss supervised narcotics cases and approved the search warrant in the Draper and Wilson case.

Ramey felt especially pressed because another officer, Timothy Lynch, who had also been present at the Draper–Wilson search, was quoted to him as saying he would sabotage the State's case. Ramey reported this to the court in the presence of Parrish and Moss during a trial recess. At the same time Ramey alluded to a purported romantic relationship between Lynch and Moss. Ramey mentioned that the State might impeach its own witness. Sorenson, having been separately charged as a result of the same incident, was also represented by Moss and Parrish.

During White's trial Ramey offered the $1000 cash as a State exhibit. Parrish objected on the ground that a complete chain of custody had not been established following the time of the Draper–Wilson trial. Outside the presence of the jury Ramey stated:

> I can lay some additional foundation if we need to go through that process, and that is the fact that the money was inventoried, not just by count, by each and every serial number written down. That inventory was signed by ... Ron Foster, Steve Foritano, from our office, and Judy Proska ... Judge Bergeson's [the presiding judge in the earlier trial] court attendant.... The serial numbers are a list here and I'll use that as an exhibit, as well. I will show the serial numbers to be, in fact, the same serial numbers and denominations on the money that is now in [the] State's exhibit....

Ramey further stated:

> [O]n April 26, 1991, ... Ron Foster ... Steve Foritano ... along with the court attendant from Judge Bergeson's court, opened State's exhibit 2 [from the Draper–

Wilson trial] sat down and serialized the money. We have that list right here, a list of serialized money. We can compare it with the money that's in there. I have in fact done that myself and that's—that money's in there and that money that's on the list is the same. I don't think we can suggest it subject to alteration. The serial numbers are the same day [sic] as they were then. The denominations and serial numbers are all listed here. Do you want to get a copy of it and check it?

Parrish declined Ramey's offer and, when asked by the court if he had any objections, stated: "I have some problems with it, but if that's the representation he's making, your honor, I'm willing to accept that that money wasn't altered." Parrish also raised another chain-of-custody concern: that Ramey himself had taken the exhibit with him when the trial recessed the previous day. Ramey, somewhat affronted, stated he had taken the money directly in his own locker.

The presiding judge, Arthur E. Gamble, told Ramey that "to eliminate any chain-of-custody problems" anyone to whom the exhibit had been released should testify as to what they did with it and how it was kept. The judge noted this might be no more than "a technical exercise" if the serial numbers on the bills matched this list, but he did not "want any error in the record and so I'll make you do it." Ramey responded, "I can guarantee that the serial numbers match up, your honor."

The foundational testimony of officer Foster followed. Ramey asked Foster, "Would you please go through the process of making sure we have exactly the same bills ... you can just compare them, and then tell us when you're done if that's the same money."

At this point Judge Gamble asked the witness to announce the serial numbers and denomination of each bill. Foster responded that the first bill in the exhibit was not included in the serialized list. Objections to the foundation followed and the exhibit was not admitted.

In discussions outside the presence of the jury, Ramey claimed no recollection of telling the court he had compared the bills to the serialized list but, when confronted with the record, conceded he had. He insists he had forgotten the discrepancy but concedes he was previously told of it. He concedes he never personally compared the bills with the list. He concedes he guaranteed the serial numbers would match up and that they did not, but insists he thought at the time they would.

Ramey urges a number of matters to be weighed in our assessment. He recalls being informed of the discrepancy but states it was only one time, more than four months before trial. He says the discrepancy was then mentioned only in passing during the course of a lengthy conference at which it was only one of many matters brought up, and not a major one.

It is significant that Ramey made the incorrect statements after already offering to put a police officer on the stand to make comparisons and after the trial judge had already announced he would be required to do so. It is not established that Ramey made the incorrect statements to avoid the proof; he simultaneously offered to let defense counsel make comparisons. And it may well be, as he insists, that Ramey did not believe there was a discrepancy when he made the statements.

Even so, this is indeed a sorry record and Judge Gamble is to be commended for referring the matter to the ethics committee. Putting the best light on it, Ramey's conduct was unacceptable. Lawyers cannot be excused for false statements on the basis of a sloppy, or even casual, unawareness of the truth. The administration of justice entrusted to our branch of government can be rendered only when our officers can be counted upon for absolute reliability and an impeccable reputation for honesty.

Perhaps the most damning of Ramey's comments was his statement that he had personally checked the bills against the list. He first insisted he had said he had *not* done so and took steps (via those recording the trial for expanded media coverage) to prove the point. But again, Ramey concedes that the trial transcript proves he also made this incorrect statement. In view of the timing of the remark it does not appear that Ramey

was attempting to deceive the court. But even if he simply misspoke, it was still a matter constituting misconduct.

The misstatement began as a "white" lie concerning what Ramey may have thought to be a mere detail. Because of the circumstances he points out, it seems likely that Ramey believed the numbers would match. In the press of an exceedingly difficult trial, perhaps without really thinking, he added the false statement that he had personally checked them and could guarantee they would match.

These circumstances are somewhat ameliorating, but do not call for reducing a suspension to a reprimand. In view of the enormous importance we place on integrity of counsel, they serve to reduce a revocation to a suspension.

II. There was another count. At the initial stage of the prosecution, White sought production of all exculpatory evidence. Ramey's response resisted some specific production requests but conceded "the State is aware of its obligations in providing exculpatory evidence." *See* DR 7–103(B) Iowa Code of Professional Responsibility (prosecutor must disclose exculpatory evidence). The court formally ordered Ramey to produce all exculpatory evidence.

As mentioned earlier, following the incident in the Draper–Wilson trial there was a separate investigation concerning Sorenson, following which Ramey filed a twenty-three count (three counts were later added) trial information against Sorenson. One witness identified in this information was Sandra K. Pfieffer, said to be Sorenson's girlfriend and confidential informant.

During July and August Ramey received police reports concerning Sorenson, including transcripts of an interview in which Pfieffer accused Sorenson of stealing lottery tickets from the Draper–Wilson residence. Ramey did not provide this report to Parrish or Moss.

The commission believed this failure amounted to a breach of Ramey's ethical duty to disclose. Ramey contends the order to disclose must be measured by the constitutional mandate in *Brady v. Maryland*, 373

U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He contends that the *Brady* mandate extends only to material matters and contends these matters were not material. The suggestion is a good rule of law, but is cited for a wrong purpose.

■ Pfieffer's statement was material and the defense was clearly entitled to it. The duty to disclose exculpatory evidence cannot be ignored because of a prosecutor's private belief that it is beside the point. The statement tended to put blame for the stolen lottery tickets on Sorenson rather than on White. It should have been disclosed.

III. Ramey's false statements violated DR 1–102(A)(4) (engage in conduct involving misrepresentation). His failure to disclose exculpatory evidence, as mentioned, violated DR 7–103(B). Selecting an appropriate sanction, always an unpleasant responsibility, is inordinately difficult in this case. His past misconduct must be considered. *See Committee on Professional Ethics & Conduct v. Ramey*, 424 N.W.2d 435 (Iowa 1988) (suspended not less than six months for income tax violation and false certification).

Upon consideration of all the circumstances we agree with the recommendation of the commission majority. We direct that the respondent James W. Ramey's license to practice law in the courts of this state, as that term is defined in Iowa Supreme Court rule 118.12, be suspended indefinitely, with no possibility for reinstatement for three months from the date of this opinion. We further order that the cost of this action be assessed against the respondent in accordance with Iowa Supreme Court rule 118.22.

**LICENSE SUSPENDED.**