**CITY OF DES MOINES, Iowa, Appellant,**

v.

**CIVIL SERVICE COMMISSION OF DES MOINES, Iowa, and Ronald White, Appellees.**

No. 93–353.

Supreme Court of Iowa.

March 23, 1994.

Rehearing Denied April 20, 1994.

Nelda Barrow Mickle, City Sol., for appellant.

Alfredo Parrish and Maggi Moss of Parrish & Kruidenier, Des Moines, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

Ron White, a seventeen-year veteran of the Des Moines Police Department, was fired after evidence seized in a drug raid turned up missing. Based on the record subsequently made in White's appeal, the Civil Service Commission found insufficient evidence to sustain the police chief's termination order. The City appealed to the district court in accordance with Iowa Code section 400.27 (1991). Upon its de novo review, the court affirmed the commission's findings and ordered White's reinstatement. On the City's appeal to this court, we affirm.

The facts are largely undisputed. In November 1990, White was the supervising sergeant in charge of a search of the apartment of Ernest Draper and Marilyn Wilson. The search yielded narcotics, cash, and other items that were photographed and seized. Five months later, during Draper's criminal trial, it was discovered that a winning $50 lottery ticket, photographed during the search, was not in evidence nor listed in the evidence log. A call to the Iowa Lottery Commission revealed that the ticket had been cashed the day after the search by White's wife, Jodi. As the trial progressed, a further discrepancy surfaced over a missing $100 bill. A mistrial was declared, and Draper and Wilson ultimately entered guilty pleas to substantially reduced charges.

Des Moines Police Chief William Moulder placed White on administrative leave pending investigation into the missing lottery ticket and cash. Jodi White told investigating officers that she found the ticket on the couple's front porch but had not mentioned the discovery to White because she knew he did not play the lottery. White denied taking the ticket from the search and disclaimed any knowledge about how the ticket had come into his wife's possession. He rejected the suggestion that someone in the department might have framed him. He voiced concern, however, that he might have been set up by the same "bad guys" that had recently committed random acts of violence against White and his family.

The chief and investigating officers, faced with the evidence sketched above, concluded that the only plausible explanation for Jodi White's possession of the lottery ticket was "pilfer[ing] from the crime scene." White was terminated on May 31, 1991, for "failure to meet the standard of conduct, accountability, and integrity" demanded of a police officer. White was also charged with third-degree theft. The chief's written grounds for termination stated, however, that the "discredit and dishonor" White's conduct had brought upon the department far outweighed any criminal charge pending against him.

White appealed the chief's decision to the Civil Service Commission in accordance with Iowa Code section 400.20. By the time the matter was heard by that body, a jury had already acquitted White of all criminal charges, and he had proved his entitlement to unemployment compensation despite the City's claim of misconduct. Moreover, the chief acknowledged that he had not been fully apprised of alleged exculpatory evidence that came to light either during the investigation or shortly after his termination decision. After hearing testimony and reviewing all documents, the commission concluded that the chief's decision was not supported by substantial evidence. It ordered White's reinstatement with full back pay and benefits.

The City appealed the commission's ruling to the district court pursuant to Iowa Code section 400.27. Following a trial de novo, the court determined that, in light of White's unwavering denial of wrongdoing, his presentation of mitigating evidence, and the City's failure to explain how the lottery ticket made its way to the Whites' property, Chief Moulder's decision rested on speculation and could not be affirmed. The court therefore ordered White's reinstatement. This appeal followed.

The City's principal claim on appeal is that the commission, and the district court, failed

to give the deference due Chief Moulder's decision. It claims the record contains substantial evidence supporting termination and that the district court erred by (1) substituting its findings for the chief's, (2) relying on evidence not before the chief when he made his decision, and (3) giving weight to expert testimony regarding disparate departmental discipline.

I. Iowa Code section 400.19 vests police chiefs with authority to peremptorily suspend, demote or discharge a subordinate officer, "for neglect of duty, disobedience of orders, misconduct, or failure to properly perform the subordinate's duties." In cases interpreting this statute, we have determined that a chief's suspension or dismissal must be for "conduct detrimental to the public interest." *Borlin v. Civil Serv. Comm'n,* 338 N.W.2d 146, 148 (Iowa 1983); *Millsap v. Civil Serv. Comm'n,* 249 N.W.2d 679, 687 (Iowa 1977). To ensure that a chief's disciplinary decision is supported by substantial evidence, chapter 400 provides for an evidentiary hearing both before the Civil Service Commission and again, de novo, in the district court. *See* Iowa Code § 400.27; *Bevel v. Civil Serv. Comm'n,* 426 N.W.2d 380, 382 (Iowa 1988). In *Bevel* we observed that this statutory scheme serves to protect civil service employees from arbitrary sanctions by their superiors. *Id.* Under section 400.27, the commission and court are free to make an independent determination regarding the disciplinary measures taken. *In re Kjos,* 346 N.W.2d 25, 29 (Iowa 1984). Therefore, we are not obliged to presume the correctness of the chief's decision, but must determine anew whether the evidence as a whole justifies an officer's discharge. *Sieg v. Civil Serv. Comm'n,* 342 N.W.2d 824, 829 (Iowa 1983).

Despite the clear language of the foregoing cases and statutes, the City argues that trial de novo does not authorize the court to "wipe out the decision of a police chief under section 400.19 and insert its own decision upon the matter." It asserts that the factual conclusions upon which the chief's decision rests are binding if supported by substantial evidence. In support of its assertion, the City cites numerous cases involving judicial review of agency action under Iowa Code section 17A.19. Because our review under section 17A.19 is on error, not de novo, these cases are inapposite. Unlike section 17A.19 review, on de novo review we *independently* construe the factual record as a whole to determine if the officer's discipline was warranted. *Sieg,* 342 N.W.2d at 829; *Millsap,* 249 N.W.2d at 688.

II. The record before us consists of documentary evidence and testimony from hearings before the chief, the commission, and the district court as well as from White's criminal trial. Throughout these proceedings, White adamantly denied removing the ticket from the search scene. The City has presented no concrete explanation for how the ticket arrived on White's front porch. It nevertheless insists that Jodi White's cashing of the ticket supports "the appearance of improper conduct" sufficient to warrant White's discharge.

While it cannot be denied that the circumstances warranted an investigation, the City attempts to discount the significance of mitigating evidence that has surfaced since chief ordered White's termination. After the judge in the Draper trial discovered the missing $100 bill, he ordered a serialization of the bills in evidence. One of the officers charged with investigating White then made a self-proclaimed "stupid mistake" in the serialization. The officer did not inform Chief Moulder of this error in his case investigation report, nor did he supplement the report at any time. The chief, like White himself, first learned of the discrepancy during White's criminal trial. The chief testified before the commission that even had this information been at his disposal, it would not have altered his decision. Pertinent to this appeal, he asserted that the serialization error had no bearing on White's discharge because the lottery ticket, and not the missing $100 bill, formed the basis for the misconduct charge. He admitted on cross-examination, however, that he "would like to have known the error that was made in counting the money" before he terminated White "because of the potential import of a problem later on."

In addition to the serialization error, the commission learned that a confidential infor-

mant, Sandra Pfeiffer, claimed immediately following White's termination that he had been wrongly accused. White's superior officers, Noel and Morton, conducted investigatory interviews with Pfeiffer in early June 1991 regarding accusations of wrongdoing she had made against another narcotics officer, Dennis Sorenson. Pfeiffer told the officers that Sorenson had given her three winning lottery tickets after the Draper search, only two of which she cashed. Sorenson was present at the Draper search, responsible for seizing evidence in the room in which the cash and lottery tickets were photographed. He stated that after a photograph was taken of a board upon which the lottery ticket and drug paraphernalia were lying, he turned the board over to the evidence custodian. The evidence custodian testified that he did not remember being given the ticket.

Pfeiffer's testimony during various interviews with Noel and Morton was undeniably equivocal. Neither investigating officer, however, related Pfeiffer's accusations against Sorenson to the chief for further investigation. In fact, the prosecution concealed the evidence from White until it came out inadvertently during his criminal trial. *See Committee on Professional Ethics & Conduct v. Ramey*, 512 N.W.2d 569, 570 (Iowa 1994). Morton admitted that the information might have affected White's case and the chief's decision had it been disclosed. The chief, acknowledging that the information would have been "interesting," testified it would not have impacted his decision.

Although White at first rejected any suggestion that someone was out to frame him, at trial he recounted in greater detail other incidents that led him to question his initial reaction. It so happened that friends of Draper and Wilson lived next door to White. Because they, too, appeared to be engaged in drug dealing, White's home had been used as a base for surveillance, leading White to believe he may have become a target for retaliation. In addition to other acts of vandalism he had experienced, the tires of a guest at his home had been slashed close to the time of the Draper trial. These events hold some relevance in light of the fact that Draper was released from custody before Jodi White found the ticket. Draper also stated upon arrest that sometimes one can "beat the charges." Finally, White stated that just prior to his termination, while a patient in an alcohol rehabilitation clinic, the window of his room was shot out and another patient was offered $1000 to "stick" him. Officer Noel admitted that he had not included the clinic incidents in his case report because he felt they were unconnected to the lottery ticket.

Although none of these mitigating circumstances, standing alone, would dispel the suspicion naturally flowing from Jodi White's possession of the lottery ticket, taken together they tend to reinforce, rather than weaken, White's unswerving claim of innocence. Because the department's case against White was totally circumstantial, and the termination rested entirely on his inability to disprove any wrongdoing, these pieces of evidence assume added importance. We find no merit in the City's claim that they should not have been considered by the commission in its evaluation of the chief's decision.

It is true that section 400.19 gives the police chief peremptory authority to suspend or terminate an officer. But the de novo hearing process that follows is designed to shed light on that decision with a fuller examination of the surrounding circumstances. Neither the commission nor the district court faulted Chief Moulder for his swift decision-making. They merely scrutinized his decision in the light of a broader record and found it lacking. Our de novo review of the record leads us to the same conclusion.

■ III. The City also complains the commission should not have admitted the testimony of William Richardson, a personnel specialist with extensive experience in the investigation of disparate disciplinary sanctions in governmental employment. His testimony was offered to show that White's dismissal for theft of a $50 lottery ticket, even if proven, would be out of proportion to the offense and inconsistent with other reported discipline within the department. He also testified that Chief Moulder erred in refusing to consider White's lengthy history of distinguished and unblemished service to the department in fashioning the appropriate sanction.

The City's objection to Richardson's testimony rested on our holding in *Johnson v. Civil Service Commission*, 352 N.W.2d 252 (Iowa 1984). *Johnson* involved disciplinary action against a police officer for use of excessive force in an arrest. The officer sought to compel production of the records of a fellow officer who faced similar charges and suffered only a thirty-day suspension. *Id.* at 255. We upheld the district court's refusal to compel production on relevancy grounds, reasoning that the public safety concerns implicated by a charge of police brutality outweigh considerations of equal punishment. *Id.*

The case before us is quite different. Although it could be argued that theft, if proven, would always compel dismissal on public safety grounds—thus making Richardson's comparative analysis irrelevant under *Johnson*—it appears that by the time of the commission hearing, the chief was no longer accusing White of theft. He, and the other investigating officers, repeatedly asserted that White's discipline rested on the mishandling of evidence seized during a search over which he had supervisory authority. This being the case, we believe Richardson's testimony bore some relevance to the inquiry.

The record revealed that during White's career he was directly involved in the seizure of many thousands of dollars in cash and other property, including valuable contraband. Although the City's brief is full of innuendo to the contrary, the record contains no credible evidence that White had ever been accused of, let alone convicted of, stealing a penny. Surely the negligent loss or misplacement of evidence, however regrettable from a public relations standpoint, would not justify termination without consideration of the officer's record of service. Richardson's testimony only served to point out Chief Moulder's failure to balance those considerations here. No reversible error appears.

**AFFIRMED.**

All Justices concur except HARRIS, J., who dissents.

HARRIS, Justice (dissenting).

I respectfully dissent even though I accept entirely the facts and controlling legal principles described in the majority opinion. The record convinces me, as it did Chief Moulder, that White did appropriate the lottery ticket. I think dismissal of the officer was warranted.