IOWA SUPREME COURT BOARD
OF PROFESSIONAL ETHICS
& CONDUCT, Appellant,

v.

Jerrold A. WANEK, Appellee.

No. 98–1423.

Supreme Court of Iowa.

Feb. 17, 1999.

As Amended on Denial of Rehearing
March 8, 1999.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for appellant.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, A P.C., Des Moines, for appellee.

NEUMAN, Justice.

Acting on questionable—if not plainly invalid—notice by ordinary mail, Iowa lawyer Jerrold Wanek secured $1.1 million judgments against the New York Times, the Chicago Tribune, and Investor's Business Daily of Los Angeles (IBD). The judgments stemmed from sanctions imposed against the corporations in a discovery dispute. Wanek managed to tie up the Tribune's and IBD's bank accounts before the process was brought to a halt by the U.S. Bankruptcy Court sitting in Des Moines. The judgments were ultimately vacated and Wanek's role in the matter was referred by U.S. Bankruptcy Judge Lee Jackwig to the Iowa Supreme Court Board of Professional Ethics and Conduct for its review and action.

The board charged Wanek with misrepresenting facts to the federal court and asserting unwarranted legal positions, all in violation of the Iowa Code of Professional Responsibility for Lawyers. A grievance commission convened to hear the matter concluded that the record supported only a finding that Wanek engaged in conduct prejudicial to the administration of justice. *See* Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(5). It determined Wanek should be privately admonished, rather than more severely sanctioned, for his conduct. *See Committee on Prof'l Ethics & Conduct v. Liles*, 430 N.W.2d 111, 113 (Iowa 1988) ("We view admonitions as considerably less severe than reprimands, and consider them to be something less than actual discipline.").

■ In accordance with Iowa Supreme Court rule 118.11, we granted the board's request for discretionary appeal. Our review is de novo. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hoffman*, 572 N.W.2d 904, 907 (Iowa 1997). As always, we are indebted to the commission for its work and give its findings and recommendation respectful consideration. *See id.* In this case, however, we think a suspension is demanded. The record demonstrates that Wanek crossed the line dividing zealous advocacy from sharp—and unethical—practice.

## I. Background.

Attorney Jerrold Wanek graduated from law school in 1983. He practices with a small firm in Des Moines, specializing in collections and bankruptcy. By all accounts he is knowledgeable in his field and respected by his peers.

If Wanek has any faults, one character witness observed, it is that he tends to take on "difficult" clients whom other lawyers "aren't willing to touch." Tim and Shirley Gerk were evidently such clients. They were referred to Wanek in 1994 by attorney Burns Mossman who was representing them in a dispute with the Internal Revenue Service. The Gerks were in the wholesale newspaper business, buying newspapers at cost and selling them retail at stands and in grocery stores. It seems that for the tax years 1987 through 1991, the IRS had disallowed the Gerks' claimed deductions for cost of goods sold, resulting in substantial tax liability. By filing bankruptcy, Mossman believed, the Gerks could stay an imminent tax sale of their residence and, at the same time, pursue discovery against nonparty newspapers with whom they had done business in order to verify the expenses disallowed by the IRS.

In June 1994, Wanek filed a chapter 13 reorganization petition on Gerks' behalf. Pertinent to this appeal, he wrote to the New York Times, the Chicago Tribune, and Investor's Business Daily requesting production within ten days of information concerning Gerks' payments for newspapers purchased from January 1987 through December 1991. He sent the letters by ordinary mail, using addresses furnished by the Gerks. As it turns out, all the addresses were either incomplete or totally inaccurate. For example, the letter mailed to the Chicago Tribune had no street address or zip code. The street addresses used for the New York Times and IBD (in Los Angeles) were just plain wrong. None of the letters was directed to a named individual, or even the legal department, at the corporate entity.

A month later, after Wanek had received no response to his informal requests, he sought an order to compel production from the bankruptcy court. His application recited that good-faith attempts at informal dis-

covery had failed. The notices of intent to file such motion, and the motion itself, were mailed to the three newspapers at the same incorrect addresses. The court's order compelling discovery, obtained in mid-September 1994, was likewise mailed to the incorrect addresses. Wanek had evidently learned by this time that the address for IBD was not good because he wrote to Mossman telling him so. The record contains no documentation to verify Wanek's claim, however, that he remailed his informal request or the court documents to a corrected address.

In early October 1994, the IRS filed a proof of claim for $1,151,036.68 against the Gerks. The size of the creditors' claims in the chapter 13 proceeding made dismissal inevitable. Thus Wanek felt pressured to promptly secure the needed proof to dispute the IRS claim. What he did not know, at least at this point, was that Gerks' business with the Times, Tribune, and IBD represented only a fraction of the Gerks' tax liability.

On December 27, 1994, Wanek moved for sanctions against all three newspapers, alleging that each

> has received an informal request under the local rules, copy of the motion to compel production of documents, a copy of the order compelling them to produce documents, and a follow-up letter requesting that compliance be made with the order.

The notice of motion for sanctions gave each newspaper eight business days in which to respond. At the same time—in accordance with local rules—Wanek prepared sanction orders for the court's signature. Each order contained a finding that the named newspaper had been properly served, had "ignored" the court's earlier order compelling production, failed to object to the motion for sanctions by the bar date, and

> [a]s a result of the order being ignored the debtors are potentially damaged or injured to the extent of $1,151,036.68 plus interest from and after June 6, 1994, at the Federal rate.

Adam Liptak, counsel for the New York Times in New York City, testified that he first learned of these discovery proceedings when the order for sanctions landed on his desk on January 12, 1995. The bar date, of course, had already passed. Liptak called Wanek immediately, explaining the misaddressed mail but agreeing to search for the needed records at once. Given the mailing error, Liptak asked that Wanek's motion for sanctions be withdrawn. Wanek declined but advised Liptak that if an objection were filed the matter would be set for hearing. Wanek wanted to keep the pressure on to be sure the needed documents were produced.

Within twenty-four hours Liptak wrote to Wanek, confirming that his document request would receive "prompt attention" and enclosing a copy of a written objection to the motion for sanctions. By this time Wanek had also heard from Paulette Dodson, counsel for the Chicago Tribune. Dodson had received the motion for sanctions on January 6, 1995 and, like Liptak, claimed to have received none of the earlier correspondence. She, too, agreed to begin searching at once for the requested records. Little did any of them—including Wanek—know that the court had already entered Wanek's proposed order for $1.1 million in sanctions against each of the corporations on January 11, 1995.

Liptak testified that roughly a week later he received a less cordial letter from Wanek and "knew that we were in a new territory." Referring to the now-discovered judgment, Wanek's letter advised it would be "difficult" for Wanek to advise his clients "to walk away from a substantial judgment such as this *without consideration*." (Emphasis added.) A similar letter to Dodson indicated the "complexion of the case" had changed and they needed to "talk settlement." The newspapers responded by hiring local counsel, Faegre & Benson, to file motions to vacate the judgments.

Meanwhile Liptak noticed that copies of documents purportedly sent to IBD in Los Angeles had been inadvertently attached to the motion for sanctions mailed to the Times. So Liptak gave IBD a courtesy call to inquire whether that company was aware of the proceedings. It was not. Liptak faxed the documents in its possession to IBD. The judgment entered against IBD, of course, was not among the documents sent. Juan Salcedo, controller for IBD, promptly wrote to Wanek

advising that he first became aware of the five-month-old discovery request on February 3. He asked for ten days to locate the information, and requested that Wanek call to let him know whether he still needed the records. Wanek did not reply. Nor did he alert Salcedo to the outstanding judgment. Instead he forwarded the letter to Mossman who, by this time, was negotiating a very favorable settlement with the IRS. In the letter to Mossman, Wanek acknowledges that Tim Gerk has told him that the documents sought from IBD

> would only result in a tax savings of about $1200 to $1500. As a result, [Gerk] is not particularly interested in having me go forward with receiving the documents from Investor's [Business] Daily but would rather see me expend energies on trying to collect the rather sizeable judgment against that company.

It gets worse. On February 15, 1995, the bankruptcy court granted the United States' motion to dismiss the Gerks' chapter 13 proceeding. Wanek, who had earlier harbored doubts about the validity of the judgments, saw this as a significant turn of events. He believed the Times' and Tribune's motions to vacate were mooted by the dismissal order. Moreover, he believed the dismissal rendered the bankruptcy court without jurisdiction to consider the motions if they were renewed by the newspapers. In his view the judgments were ripe for execution and he felt ethically bound to pursue that course for his clients.

In mid-March, counsel for the Tribune sought a conference call with the parties and Judge Jackwig to clarify the status of the motions to vacate the judgments. Evidently believing Wanek still needed information held by the newspapers, the court reopened the bankruptcy for "the limited purpose of allowing the parties to make a good faith effort to work out the underlying discovery problems." The court directed the parties to submit a consent order vacating the judgments or scheduling an evidentiary hearing on the pending motions.

Meanwhile, Salcedo at IBD had gathered records pertinent to the Gerks' account and called Wanek to inquire whether he still wanted them. Salcedo was still unaware that judgment had been entered against IBD. Wanek did not tell him.

On April 14, 1995, counsel for the Tribune learned that a U.S. Marshall had shown up at the Tribune's bank to execute on the $1.1 million judgment. She pleaded with the bank for more time and contacted Des Moines counsel to seek an emergency stay order. A stay was granted. During the hearing, Judge Jackwig expressed surprise at learning of the execution and made plain that the intent of her earlier order was to establish a "cooling off period." She directed Wanek to "cease pursing this course of action." Her admonition evidently fell on deaf ears. On May 16, Juan Salcedo first learned of the judgment for sanctions against IBD when the corporation's bank account was frozen following service of writ of execution in Los Angeles. The execution was issued in spite of the fact that the IRS and the Gerks had settled their dispute in mid-April for $112,265 and, according to Burns Mossman, the settlement removed any need for further documentation from the newspapers.

IBD moved to vacate the judgment and requested an immediate stay of execution. Judge Hill, standing in for Judge Jackwig on an emergency basis, granted the stay over Wanek's objection to the court's jurisdiction and his claim IBD was properly served by mail with the motion for sanctions. In his subsequent written resistance to IBD's motion to vacate, Wanek summarized the mailings to IBD and asserted "all of the foregoing letters were sent to the correct address, no mail was returned undelivered."

During the next three months counsel pursued discovery in anticipation of the hearing on the newspapers' motions to vacate. Wanek moved to withdraw from the case in expectation that he would be called as a witness. Prior to deposing Wanek, counsel for the newspapers reviewed Mossman's file and saw Wanek's October 1994 letter acknowledging that mail to IBD had been returned to him. During his deposition, Wanek admitted that the first letter to IBD was returned to him and may not have been remailed. He confirmed this admission in writing to counsel. After his file was turned over to new counsel for Gerks, Michael Mallaney, a more

thorough search yielded *three* letters addressed to IBD and returned undelivered as well as one returned letter addressed to the New York Times in Oak Park, Illinois.

Just prior to hearing in the bankruptcy court, the Gerks (through their new counsel) agreed to vacate their judgment against IBD. Following a lengthy lecture by Judge Jackwig outlining her view of the events leading up to trial, counsel reached an agreement vacating the judgments against the newspapers as well. Remaining unresolved was a request for costs and attorney fees from Wanek pursuant to 28 U.S.C. § 1927. Under that statute, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Judge Jackwig denied the request for fees but referred the file to the Iowa Supreme Court Board of Professional Ethics and Conduct for "its independent review and appropriate disposition."

## II. Issues on Appeal.

Based on the record just described, the board charged Wanek with violating the following provisions of the Iowa Code of Professional Responsibility for Lawyers: DR 1–102(A)(4), (5), (6) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; conduct prejudicial to administration of justice; and conduct reflecting adversely on fitness to practice law); DR 7–102(A)(1), (2) (lawyer shall not take action on behalf of client when lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another and shall not knowingly advance unwarranted claim); DR 7–102(A)(3) (lawyer shall not conceal or knowingly fail to disclose that which lawyer is required by law to reveal); and DR 7–102(A)(5) (lawyer shall not knowingly make false statement of fact in representation of client).

As already noted earlier in this opinion, however, the grievance commission which heard the evidence found Wanek guilty only of engaging in conduct prejudicial to the administration of justice, a violation of DR 1–102(A)(5). The commission decision acknowledges proof that Wanek "did make certain representations" to the federal court about the accuracy of the IBD mailings and "did not follow up in efforts to advise the Court on these matters." The commission credited Wanek for eventually advising opposing counsel concerning these matters. It also found that Wanek was "perhaps over zealous at times in pursuing the interest of his client." But the commission believed the board failed to prove whether Wanek's conduct was intentional or merely reflected "a lack of due diligence ... in tracking his file." On balance, it recommended a private admonition.

On appeal the board contends the commission misapprehended the proof requirements necessary to sustain a violation of DR 1–102(A)(4). It argues the commission incorrectly assumed the board has a duty to prove a respondent's subjective intention to mislead. Absent a respondent's confession, the board argues, this would place an impossible burden on the board.

The board also argues that the record establishes *multiple* misrepresentations, distinguishing this case from *Committee on Professional Ethics & Conduct v. Bitter*, 279 N.W.2d 521 (Iowa 1979). *Bitter* involved an attorney's application for extension of appellate deadlines which failed to acknowledge additional correspondence tending to show the court reporter had completed the necessary transcript. *Bitter*, 279 N.W.2d at 526. The omitted letters were not material, and we held that a misrepresentation resulting from "mere negligence" based on "haste" or "oversight" did not amount to a violation of DR 1–102(A)(4). Id. Here, the board argues, the record reveals material representations to the court concerning adequacy of notice to sustain resulting judgments, overstating (or failing to correct a misimpression about) the alleged damages sustained by respondent's clients, and testifying falsely at his deposition. It argues the case is more akin to *Committee on Professional Ethics & Conduct v. Ramey*, 512 N.W.2d 569 (Iowa 1994), and *Iowa Supreme Court Board of Professional Ethics & Conduct v. Smith*, 569 N.W.2d 499 (Iowa 1997). In those cases, the

offending lawyers were suspended for making statements to the court which tended, overall, to mislead rather than inform. *See Smith,* 569 N.W.2d at 501 (lawyer's accounting in probate attempted to conceal unauthorized disbursement of fees); *Ramey,* 512 N.W.2d at 571 ("Lawyers cannot be excused for false statements on the basis of a sloppy, or even casual, unawareness of the truth.").

■ The board also argues the record supports its claim that Wanek asserted unwarranted legal positions in violation of DR 7–102(A)(1) and (2). The commission seemed to excuse Wanek for being a bit overzealous, especially with respect to the IBD judgment, on the ground his "difficult clients" pressured him to pursue the claim. Client pressure, the board rightly asserts, does not justify the assertion of an unwarranted legal position. *See Committee on Prof'l Ethics & Conduct v. Hearity,* 460 N.W.2d 448, 449 (Iowa 1990) (no defense that lawyer, reneging on settlement agreement, acted at insistence of difficult clients). Wanek responds that he at all times maintained a good-faith belief in the soundness of the legal positions he was advancing.

Finally, the board argues that the misconduct demonstrated here calls for more discipline than the private admonition recommended by the commission. Wanek's able appellate counsel counters that leniency is appropriate because applying 20–20 hindsight in a complex case will inevitably lead to the discovery of some "blunder" by a lawyer. "This is a function of the stress of everyday practice and the human condition," he argues. He also emphasizes that Wanek has never before been subject to discipline and enjoys a reputation for honesty and integrity among those who practice regularly in the field of bankruptcy.

## III. Analysis and Conclusion.

We have read the record made before the commission, including two days of live testimony, transcripts of proceedings in federal bankruptcy court, numerous documentary exhibits, and the thorough briefs of appellate counsel. Several troubling themes emerge: A certain cynicism about any representations made by "big city" lawyers who claim not to have received documents sent weeks earlier. A certain attitude that a million dollar judgment—whether justifiable or not—makes for good leverage when it comes to catching the attention of big corporations. And when it is "the little guy" versus a "big guy" like the IRS or the New York Times, and it all turns out "okay" in the end, a little prevarication here and there doesn't really matter.

We are convinced Jerrold Wanek was swept up in this stereotypic thinking and lost his good judgment in the process. At the outset he justifiably relied on a good-faith difference of opinion whether bankruptcy rules permit discovery against nonparty, out-of-state entities by ordinary mail rather than subpoena.[1] He justifiably relied on the venerable rule that ordinary mail, deposited in a U.S. mailbox, is presumed to have arrived at its intended destination. He reasonably assumed, based on the IRS claim in bankruptcy, that his clients stood to lose over a million dollars if he did not secure records from the newspapers to discredit the IRS assumptions. But a reasonable lawyer reading this record would be hard pressed not to believe that, as circumstances changed, Wanek should have, in good faith, backed off. He recklessly disregarded important mailings returned from IBD and the New York Times as undeliverable. He callously discounted lawyers' claims that the documents were not received in time to respond by the bar dates. He utterly failed to reply to a California corporation's inquiry concerning a discovery dispute about which it previously had no notice. And he doggedly pursued execution against that corporation, knowing it was oblivious to the judgment or its antecedents and, more importantly, knowing by then that

---

1. Testimony before the commission revealed an unwritten local practice permitting document requests by ordinary mail that may or may not be consistent with notice required under the federal rules of civil procedure and federal bankruptcy rules, depending on party or nonparty status, the nature of the proceedings (contested or noncontested), and the location of the entity upon which discovery is sought. See generally Fed. R. Bankr.P.2004, 7004, 9014, 9016; Fed.R.Civ.P. 4, 45; 9 Collier on Bankruptcy § 2004.03 (15th ed. rev.1998); 10 Collier on Bankruptcy § 9014.02–.03. It is well beyond the scope of this opinion to resolve that controversy.

the judgment he secured was totally out of proportion to the actual damages attributable to the IBD records.

Wanek's failure to set the record straight at crucial stages in the Gerks' chapter 13 reorganization clearly misled the bankruptcy court. As succinctly stated by Judge Jackwig, she postponed ruling on the validity of the judgments to enable the debtors in good faith to pursue needed discovery, "not make money."

We cannot overlook the fact that obvious mistakes over misaddressed mail, believed to be easily correctable by three professionals in New York City, Chicago, and Los Angeles, ended up involving them in six months of litigation in Iowa at a cost of nearly $100,000. Those of us on the appellate bench may be so removed from the reality of day-to-day practice that we are unreasonably shocked at such excess. But we are justifiably dismayed to think the lawyers involved here— from the advocates to the grievance commissioners—may have lost their idealism about how professionals might handle things with less nonsense and more civility.

■ In conclusion, we are satisfied by a convincing preponderance of the evidence that Jerrold Wanek misrepresented material facts in his written and oral advocacy to the court and in deposition testimony, in violation of DR 1–102(A)(4) and (6) and DR 7–102(A)(5). *See Committee on Prof'l Ethics & Conduct v. Zimmerman,* 354 N.W.2d 235, 237–38 (Iowa 1984) (failure to advise court of critical facts "evinces indefensible irresponsibility and a conscious disregard for the rights of a litigant"; such conduct "cannot be excused by claiming ignorance and supports a finding respondent willfully and irresponsibly misled the court"). This conduct was prejudicial to the administration of justice, as previously found by the commission, in violation of DR 1–102(A)(5). The record also establishes, by the requisite standard of proof, that Wanek's dogged pursuit of substantial judgments in the face of compelling legal and factual evidence dictating a contrary course violates the spirit of DR 7–102(A)(1) and (2).

■ We suspend Jerrold Wanek's license to practice law in this state indefinitely, with no possibility of reinstatement for two months. This suspension shall apply to all facets of the practice of law. *See* Court Rule 118.12. Upon application for reinstatement, the respondent shall furnish proof that he has complied with the notification and disengagement requirements of rules 118.13 and 118.18. Costs are assessed to the respondent.

**LICENSE SUSPENDED.**