# IN THE SUPREME COURT OF IOWA

No. 26 / 06-1885

Filed April 6, 2007

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD**,

Appellee,

vs.

**DON E. GOTTSCHALK**,

Appellant.

---

On review of the findings and recommendations of the Supreme Court Grievance Commission.

Grievance Commission recommends suspension of Gottschalk's license to practice law. **LICENSE SUSPENDED.**

Paul T. Shinkle, Cedar Falls, for appellant.

Don E. Gottschalk, Cedar Falls, pro se.

Charles L. Harrington and Wendell J. Harms, Des Moines, for appellee.

**LARSON, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board charged Don E. Gottschalk with numerous violations of the Iowa Code of Professional Responsibility for Lawyers and the Iowa Rules of Professional Conduct.[1] The Grievance Commission concluded that Gottschalk violated certain provisions of the Iowa Code of Professional Responsibility and Iowa Rules of Professional Conduct and recommended that we suspend Gottschalk's license to practice law for a period of not less than two years.

We agree with some of the commission's findings of misconduct, and suspend Gottschalk's license to practice law for a period of not less than one year.

## I. *Standard of Review.*

Our review of attorney disciplinary proceedings is well established. We review the commission's findings de novo. *See* Iowa Ct. R. 35.10(1) (2005); *Iowa Supreme Ct. Attorney Disciplinary Bd. v. Lesyshen,* 712 N.W.2d 101, 104 (Iowa 2006).

> "We give respectful consideration to the Grievance Commission's findings and recommendations, but are not bound by them."
>
> The Board must prove attorney misconduct by a convincing preponderance of the evidence. This burden is less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case. Once misconduct is proven, we "may impose a lesser or greater sanction than the discipline recommended by the grievance commission."

*Iowa Supreme Ct. Attorney Disciplinary Bd. v. Conrad,* 723 N.W.2d 791, 791-92 (Iowa 2006) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett,* 674 N.W.2d 139, 142 (Iowa 2004)).

---

[1]The Iowa Rules of Professional Conduct became effective July 1, 2005, replacing the Iowa Code of Professional Responsibility for Lawyers. Some of the conduct in this case occurred before the effective date of the new rules and some after.

## II. *Factual Findings.*

Gottschalk practices law in Iowa and, at the time of the conduct involved in this case, resided in Black Hawk County. The board filed this complaint with the commission, charging neglect, misrepresentation, conduct reflecting adversely on Gottschalk's fitness to practice law, conduct prejudicial to the administration of justice, and failure to return a client file, arising from Gottschalk's representation of five separate clients.

A. *The Barbara Malone estate.* Gottschalk was designated as the attorney for the executor of the Barbara Malone estate in January 1999. The clerk of court issued delinquency notices in May 1999 and December 2000 for Gottschalk's failure to file interlocutory reports. In December 2002 and again in July 2003, the court deemed the estate delinquent for Gottschalk's failure to progress toward closure. The court ordered Gottschalk to close the estate or file a supplemental case status report by September 1, 2003. Gottschalk did not do either, and the court again ordered Gottschalk to close the estate or file a supplemental case status report by November 1, 2003. Gottschalk did not close the estate nor did he file a supplemental case status report by the November 2003 deadline, and as a result, the court set a show-cause hearing for January 5, 2004, at which the executor and Gottschalk would be required to show why they should not be removed from the case. The show-cause hearing was continued, at Gottschalk's request, until June 4, 2004.

Gottschalk filed the final report for the estate on May 13, 2004. However, the final report contained a number of misrepresentations, including that the executor's notice of appointment had been published and proof of publication was on file, that the Iowa Department of Revenue inheritance/estate tax and income tax acquittances were on file, affidavits concerning the executor's and Gottschalk's fees were on file, the

beneficiaries had waived the executor's accounting of estate money and personal property in her possession, and the estate beneficiaries had waived hearing on the final report and consented to its approval, the executor's discharge, and the estate's closing.

At the June 2004 show-cause hearing, the court found good cause to remove Gottschalk as attorney for the executor for his misrepresentations in the final report. The court further imposed sanctions in the amount of $5000. Gottschalk had not paid the $5000 sanction by May 3, 2005, and was again ordered by the court to pay that sum. Gottschalk finally complied with the court's order.

The executor of the estate did not appear for the June 2004 show-cause hearing, stating that Gottschalk did not provide her with notice of the hearing. The court ordered the executor to appear in September 2004 to show cause why she should not be held in contempt for her failure to appear.

B. *The Miller bankruptcy.* Mary Ann and Jay D. Miller retained Gottschalk to assist them in filing for bankruptcy in an effort to save their home from foreclosure. After their initial meeting, Gottschalk and the Millers agreed to move forward with a chapter 13 bankruptcy. The Millers determined that the monthly payments originally calculated were too high and requested that Gottschalk revise the plan to provide for lower payments before filing the bankruptcy petition. Though it is unclear whether an acceptable monthly payment was ultimately calculated, it is clear that the Millers were under the impression Gottschalk would file the bankruptcy petition in February 2004, and they would then be advised of the hearing date. Gottschalk did not file the bankruptcy petition on the Millers' behalf in February 2004.

The Millers met with Gottschalk in early March 2004 after receiving a sheriff's lien notifying them that their home was to be sold at a sheriff's sale on April 14, 2004. The Millers were very concerned about losing their home, and Gottschalk assured them he would file the petition for bankruptcy, and a court hearing would be set in April. The Millers also retrieved some financial information they had previously provided to Gottschalk so he could complete their income tax returns. Apparently he had not done so, and the Millers decided to have someone else complete their tax returns. The Millers did not receive a notice of court hearing in the bankruptcy they thought Gottschalk had filed, nor did Gottschalk contact them again in March or April 2004 regarding their bankruptcy or the sheriff's sale.

On April 30, 2004, the Millers received an eviction notice advising them to vacate their home within six days. The Millers contacted Gottschalk regarding the eviction, and he told them he did not file the bankruptcy petition because he was waiting for them to provide him with their income tax information. It is unclear whether Gottschalk told the Millers that he needed this information prior to filing the bankruptcy petition. Gottschalk told the Millers he would make some calls regarding the eviction; however, he did not contact the Millers despite numerous attempts by the Millers to get in touch with him. The Millers were evicted from their home. The Millers requested their file from Gottschalk, who returned most of the file but retained some of his notes and calculations, contending they were his property.

C. *Jeremy Durnan matter.* Gottschalk represented Mr. Durnan in an appeal of his dissolution of marriage. Gottschalk filed a notice of appeal on behalf of Mr. Durnan and, in July 2004, notified Mr. Durnan in writing that he would need $600 for the cost of the trial transcript. Apparently,

Mr. Durnan did not submit the $600 to Gottschalk, explaining that he could not raise the money. Gottschalk did not file and serve the proof brief or designate the appendix by the court-imposed deadline. After receiving a notice of default from the court, Gottschalk sent a letter to Mr. Durnan explaining that he could not proceed with the appeal without the transcript. The court dismissed the appeal on November 22, 2004, because of Gottschalk's failure to file and serve the brief by the deadline set in the notice of default.

D. *Scott Peterson matter.* Gottschalk represented Scott Peterson in his dissolution-of-marriage action. Craig Ament, attorney for Mr. Peterson's ex-wife, prepared a proposed stipulation and decree of dissolution. The stipulation required that Mr. Peterson's ex-wife be allowed to walk through the house and resolve any issues of disputed property prior to the decree being entered. On September 9, 2005, Mr. Ament sent the stipulation and decree to Gottschalk with a cover letter reiterating that the walk-through had to be completed before the stipulation and decree were filed. On September 12, 2005, Mr. Ament sent Gottschalk a substituted decree with a name-change clause and again emphasized the walk-through provision. Mr. Ament also left a message for Gottschalk on September 12, 2005, notifying him of the substituted decree. On September 13, 2005, prior to receiving the substituted decree, Gottschalk presented the September 9, 2005 decree to the court without notifying the court of the walk-through provision. The court signed the decree, and it was entered. The walk-through had not yet been completed. Upon discovering that the decree had been entered, Mr. Ament contacted the court and had the decree set aside.

E. *Bobbie Jo Bengston matter.* Gottschalk represented Bobbie Jo Bengston in a domestic-relations matter involving the temporary physical placement of Ms. Bengston's minor child. Dustin Bengston filed an

application for temporary physical placement of the child, and a hearing on the application was set for September 13, 2005. Ms. Bengston moved to Arkansas in August 2005 and did not appear for the September 2005 hearing. The court concluded that Gottschalk forgot to notify her of the date and time of the hearing. As a result, the hearing was continued until October 13, 2005, at which time Ms. Bengston did appear.

### III. *Ethical Violations.*

A. *Neglect.* We have held that professional neglect involves "indifference and a consistent failure to perform those obligations that a lawyer has assumed, or a conscious disregard for the responsibilities a lawyer owes to a client." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Moorman,* 683 N.W.2d 549, 551 (Iowa 2004). Neglect is more than negligence, and it often involves procrastination, "such as a lawyer doing little or nothing to advance the interests of a client." *Id.* at 552.

Gottschalk repeatedly failed to perform the functions required as attorney for the executor of the Malone estate, to meet deadlines, to appropriately respond to court orders, and to close the estate within a reasonable period of time in violation of DR 6-101(A)(3). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold*, 642 N.W.2d 288, 293 (Iowa 2002). Further, after being sanctioned for his inadequate representation, Gottschalk failed to pay his court-imposed fine for ten months after it was ordered.

We are particularly troubled by Gottschalk's neglect of the Millers' bankruptcy in violation of DR 6-101(A)(3), DR 7-101(A)(1) (a lawyer shall not intentionally fail to seek the lawful objectives of a client), DR 7-101(A)(2) (a lawyer shall not intentionally fail to carry out a contract of employment with a client), and DR 7-101(A)(3) (a lawyer shall not intentionally prejudice or damage a client). Gottschalk agreed to assist the Millers in keeping their

home and did little to advance his clients' interests. We acknowledge the difficulty Gottschalk had in determining a monthly payment the Millers could afford; however, that does not relieve him of his duty to pursue their interests. *See Iowa Supreme Ct. Bd of Prof'l Ethics & Conduct v. Sherman*, 619 N.W.2d 407, 409 (Iowa 2000). Gottschalk repeatedly informed the Millers that he was taking care of their petition for bankruptcy when, in reality, he was not. Additionally, Gottschalk failed to follow up with the Millers regarding return of their income tax information even though he knew he needed the information to file the petition for bankruptcy. Particularly after receiving notice of the sheriff's sale, Gottschalk failed to communicate with his clearly distraught clients and "failed to act to protect the client's interests at a critical time when action was required and could not be delayed any longer." *Moorman*, 683 N.W.2d at 552. Gottschalk's neglect in this case resulted in the loss of the Millers' home.

Gottschalk's failure to file the appropriate documents in Mr. Durnan's appeal also constitutes neglect in violation of DR 6-101(A)(3). Though it appears Mr. Durnan was no longer interested in pursuing his appeal, Gottschalk had a duty to take the steps necessary to end the matter. Simply waiting for the court to dismiss the appeal for lack of prosecution constitutes neglect. *Lesyshen*, 712 N.W.2d at 105.

B. *Misrepresentation.* Gottschalk's misrepresentations to the court in the Malone estate final report violated DR 1-102(A)(4). Though Gottschalk contends it has always been his practice to submit final reports without first having submitted the underlying documents, this " 'casual, reckless disregard for the truth' warrants discipline." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Daggett*, 653 N.W.2d 377, 380 (Iowa 2002). Negligent misrepresentation does not constitute a violation of DR 1-102(A)(4); however, we have held that recklessness can support a finding of

misrepresentation. *Grotewold*, 642 N.W.2d at 293. Just as in *Grotewold*, Gottschalk's "misinformation to the court that the uncompleted tasks in the estate had been completed was based on hope and an intention that those tasks would eventually be completed. Yet, his conduct did not result from negligence, but his casual, reckless disregard for the truth." *Id.* We expect attorneys to provide reliable and accurate information to the court. "Our system of justice requires 'absolute reliability and an impeccable reputation for honesty.' " *Id.* (quoting *Comm. on Prof'l Ethics & Conduct v. Ramey,* 512 N.W.2d 569, 571 (Iowa 1994)). Gottschalk's disregard for the truth in this matter cannot be excused.

Additionally, Gottschalk's failure to inform the court of the walk-through provision in Mr. Peterson's dissolution decree violated Iowa Rule of Professional Conduct 3.3(d) ("In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse."). We acknowledge Gottschalk's contention that he inadvertently forgot about the walk-through provision; however, we conclude that this omission was more than mere negligence considering Mr. Ament's emphasis on the provision in his letter to Gottschalk just days prior to Gottschalk presenting the stipulation and decree to the court. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ackerman*, 611 N.W.2d 473, 474 (Iowa 2000) ("At its most basic level a court must rely, not alone on the honesty of lawyers, but also on the reliability of factual representations submitted to the court. A misrepresentation cannot be explained away, and certainly not justified, on the basis of disorganization and confusion."); *Ramey*, 512 N.W.2d at 571 ("Lawyers cannot be excused for false statements on the basis of a sloppy, or even casual, unawareness of the truth. The administration of justice entrusted to our branch of government can be

rendered only when our officers can be counted upon for absolute reliability and an impeccable reputation for honesty."). Both Mr. Ament and the judge who signed the decree were disturbed by Gottschalk's inappropriate conduct. "A lawyer must fully disclose all facts tangentially relevant and material to a judge's decision" and a lawyer's failure to do so amounts to misrepresentation. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Humphrey*, 551 N.W.2d 306, 308 (Iowa 1996).

C. *Fitness to practice law and prejudice to the administration of justice.* Gottschalk's failure to respond to court orders, his failure to timely file documents with the court, his failure to adequately pursue his clients' interests, and his misrepresentations to the court is conduct that reflects adversely on Gottschalk's fitness to practice law in violation of DR 1-102(A)(6) and is conduct that is prejudicial to the administration of justice in violation of DR 1-102(A)(5) and Iowa Rule of Professional Conduct 8.4(d). *See Iowa Supreme Ct. Attorney Disciplinary Bd. v. Kadenge*, 706 N.W.2d 403, 408-09 (Iowa 2005); *Iowa Supreme Ct. Attorney Disciplinary Bd. v. Sotak*, 706 N.W.2d 385, 389 (Iowa 2005); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Honken*, 688 N.W.2d 812, 817 (Iowa 2004); *Daggett*, 653 N.W.2d at 381.

D. *Failure to return client file.* Upon the Millers' request for their file, Gottschalk refused to provide them with his working papers, notes, and calculations regarding their bankruptcy, contending they were attorney work product and, as such, were not part of the client file. We have not yet addressed this issue and take the opportunity to do so now.

In general, there are two approaches for determining who owns the documents within a client's file—the "entire file" approach and the "end product" approach. *See Henry v. Swift, Currie, McGhee & Hiers, LLP*, 563 S.E.2d 899, 902 (Ga. Ct. App. 2002). The majority of jurisdictions that have

addressed this issue conclude that a client owns his or her entire file, including attorney work product, subject to narrow exceptions. *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn*, 689 N.E.2d 879, 881 (N.Y. 1997). This is the view adopted by the Restatement (Third) of The Law Governing Lawyers section 46(2) (2000): "On request, a lawyer must allow a client or former client to inspect and copy any document possessed by the lawyer relating to the representation, unless substantial grounds exist to refuse." Comment *c* further clarifies that "[[a] client's right to his or her file] extends to documents placed in the lawyer's possession as well as to documents produced by the lawyer." The Restatement provides a few narrow exceptions to a client's right to the file. A lawyer may deny a client's request to retrieve, inspect, or copy documents when compliance would violate the lawyer's duty to another. Two such situations relevant here are described in the Restatement:

> [A] lawyer may properly refuse for a client's own benefit to disclose documents to the client unless a tribunal has required disclosure. . . .
>
> A lawyer may refuse to disclose to the client certain law-firm documents reasonably intended only for internal review, such as a memorandum discussing which lawyers in the firm should be assigned to a case, whether a lawyer must withdraw because of the client's misconduct, or the firm's possible malpractice liability to the client.

Restatement (Third) of The Law Governing Lawyers § 46, cmt. *c*; *see also Sage Realty Corp.*, 689 N.E.2d at 883.

A minority of jurisdictions distinguish between documents that are the end product of an attorney's representation and those that are work product. The end product includes pleadings, correspondence, and "other papers 'exposed to public light by the attorney to further [the] client's interests' " and belong to the client. *Sage Realty Corp.*, 689 N.E.2d at 881 (quoting *Fed. Land Bank v. Fed. Intermediate Credit Bank*, 127 F.R.D. 473,

479 (S.D. Miss. 1989)).  The attorney's work product includes preliminary documents " 'used by the lawyer to reach the end result,' such as internal legal memoranda and preliminary drafts of pleadings and legal instruments" and belong to the attorney.  *Id.* at 882 (quoting *Fed. Land Bank,* 127 F.R.D. at 479).

We agree with the majority of jurisdictions and adopt the "entire file" approach to this issue.  Attorneys are in a fiduciary relationship with their clients requiring open and honest communication to ensure effective representation.  "The relationship between a client and an attorney . . . [is] one of '[t]he most abundant good faith; absolute and perfect candor or *openness* and honesty; the *absence of any concealment* or deception, however slight.' "  *Resolution Trust Corp. v. H----, P.C.,* 128 F.R.D. 647, 648-49 (N.D. Tex. 1989) (quoting *Texas v. Baker,* 539 S.W.2d 367, 374 (Tex. Civ. App. 1976)).  Allowing an attorney to unilaterally refuse to provide the client with documents created in the course of representation is contrary to this relationship.  *See Sage Realty Corp.,* 689 N.E.2d at 882-83 ("That obligation of forthrightness of an attorney toward a client is not furthered by the attorney's ability to cull from the client's file documents generated through fully compensated representation, which the attorney unilaterally decides the client has no right to see."); *Resolution Trust Corp.,* 128 F.R.D. at 649-50 (" '[An attorney] has no right or ability to unilaterally cull or strip from the files created or amassed during his representation of that client documents which he determines the client is not entitled to see.  The client is either entitled to all of the file or none of it.' " (quoting *In re Kaleidoscope, Inc.,* 15 B.R. 232 (Bankr. N.D. Ga. 1981), *rev'd on other grounds*, 25 B.R. 729 (N.D. Ga. 1982))).

In light of this holding, Gottschalk's failure to return the Millers' complete file is a violation DR 9-102(B)(4) (providing that a lawyer shall

promptly deliver to the client property the client is entitled to receive). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb*, 589 N.W.2d 746, 748 (Iowa 1999). The working papers, notes, and calculations Gottschalk made during his meetings with the Millers were clearly created for the Millers' benefit and do not fall within the exceptions outlined above.

In summary, we find the board has proven by a convincing preponderance of the evidence that Gottschalk violated the following disciplinary rules and rules of professional conduct: DR 1-102(A)(1), DR 1-102(A)(4), DR 1-102(A)(5), DR 1-102(A)(6), DR 6-101(A)(3), DR 7-101(A)(1), DR 7-101(A)(2), DR 7-101(A)(3), DR 9-102(B)(4), Iowa R. of Prof'l Conduct 32:3.3(d), rule 32:8.4(a), and rule 32:8.4(d).

**IV.** *Sanction.*

There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case. *Plumb*, 589 N.W.2d at 748-49. In determining an appropriate sanction, we consider "the nature of the violations, the need for deterrence, protection of the public, maintenance of the reputation of the Bar as a whole, and the violator's fitness to continue to practice law," as well as any aggravating and mitigating circumstances. *Grotewald*, 642 N.W.2d at 294; *Ramey*, 639 N.W.2d at 245. "Often, the distinction between the punishment imposed depends upon the existence of multiple instances of neglect, past disciplinary problems, and other companion violations." *Lesyshen*, 712 N.W.2d at 106.

The commission recommends we suspend Gottschalk's license to practice law for a period of not less than two years. While we agree that Gottschalk's misconduct is serious, we conclude that a less severe sanction is warranted. The sanction for neglect of client legal matters generally

ranges from public reprimand to six-month suspension. *Grotewald*, 642 N.W.2d at 294. However, when neglect results in harm to the client, as Gottschalk's neglect resulted in harm to the Millers, a more severe sanction is warranted. *Honken*, 688 N.W.2d at 821. Additionally, we have held that multiple incidents of neglect, as is the case here, become aggravating circumstances in considering an appropriate sanction. *Moorman*, 683 N.W.2d at 552.

Gottschalk not only neglected his clients' legal matters, he also made misrepresentations to the court. Misrepresentation to the court constitutes a serious breach of professional ethics, warranting a more severe sanction than neglect. "Considering the importance of honesty to our profession, we have stated that misrepresentation by a lawyer . . . generally results in 'a lengthy suspension.' " *Grotewold*, 642 N.W.2d at 294 (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stein,* 603 N.W.2d 574, 576 (Iowa 1999)).

Finally, we must consider Gottschalk's disciplinary history as past violations constitute an aggravating factor in determining an appropriate sanction. *Iowa Supreme Ct. Bd. of Prof'l Ethics and Conduct v. Hohenadel,* 634 N.W.2d 652, 656 (Iowa 2001). Since 1993 Gottschalk has been privately admonished twice for neglect, publicly reprimanded three times for neglect, and has had his license to practice law suspended for one year for trust account violations and misrepresentation.

The purposes of attorney disciplinary proceedings include "protecting the courts and the public from persons unfit to practice law, vindicating public confidence in the integrity of our system of justice, and deterring other lawyers from similar misconduct." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hansel,* 558 N.W.2d 186, 192 (Iowa 1997). In light of the facts and circumstances of this case, we conclude that a suspension of

Gottschalk's license to practice law for a period of not less than one year is appropriate.

The previous sanctions imposed on this respondent—two private admonitions, three public reprimands, and a one-year suspension—have apparently not been effective. We now feel compelled to warn him of what should be obvious—any future violations of our disciplinary rules will be met with sanctions up to and including revocation. We trust that will not be necessary.

**V.** *Conclusion.*

Gottschalk's license to practice law is suspended indefinitely with no possibility of reinstatement for at least one year. This suspension shall apply to all facets of the practice of law. Iowa Ct. R. 35.12(3). Gottschalk shall provide all of the notifications required by Iowa Court Rule 35.21. Upon any application for reinstatement, Gottschalk shall have the burden to show he has not practiced law during the period of suspension and that he meets the requirements of Iowa Court Rule 35.13. Costs are taxed to Gottschalk pursuant to Iowa Court Rule 35.25(1).

**LICENSE SUSPENDED.**