CIVIL SERVICE COMMISSION OF
CORALVILLE, Iowa, Appellant,

v.

Britton JOHNSON, Appellee.

No. 01–1005.

Supreme Court of Iowa.

Oct. 9, 2002.

Rehearing Denied Dec. 2, 2002.

Peter L.J. Pashler and Randall H. Stefani of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellant.

William H. Roemerman of Crawford, Sullivan, Read & Roemerman, P.C., Cedar Rapids, and Tom Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellee.

LAVORATO, Chief Justice.

The Civil Service Commission of Coralville (Commission) appeals from a district court ruling reducing the disciplinary sanction imposed against Britton Johnson from termination of employment to a thirty-day suspension. Johnson cross-appeals, contending the discipline imposed by the district court should be reduced or eliminated. On our de novo review, we reverse on appeal the decision of the district court and remand for an order reinstating the Commission's original termination decision. Our decision on appeal disposes of the cross-appeal.

## I. Background Facts and Proceedings.

Britton Johnson has been in law enforcement since 1974. In the latter part of

1983, he began working as a police officer with the Coralville Police Department.

In late 1994 and early 1995, a series of armed robberies of restaurants occurred in western Illinois and eastern Iowa. In November 1994, a robbery occurred at the Bonanza restaurant in Coralville. At the time, Johnson was a detective with the Coralville Police Department. In that capacity, he was assigned to investigate the robbery.

Michael Bowers, a detective with the Davenport Police Department, was also investigating the restaurant robberies. Working with Bowers, Johnson determined that Michael Constantino was a suspect in the Bonanza restaurant robbery.

Johnson, Bowers, and Donald Smith, a detective with the Davenport Police Department, interrogated Constantino at the Davenport Police Station on February 23, 1995. The interrogation lasted several hours, during which Constantino provided information about several of the robberies under investigation. In providing that information, Constantino made incriminating statements about his involvement in the Coralville Bonanza restaurant robbery.

Unbeknownst to Johnson, the Davenport detectives recorded the first ninety-one minutes of the Constantino interrogation on audiotape. Johnson did not learn of the recording until after he completed his report of the interrogation.

In May 1995, a federal grand jury indicted Constantino and three others on charges of conspiracy to obstruct commerce by robbery and extortion. Constantino moved to suppress the statements he made to the officers during the February 23, 1995, interrogation. Johnson testified at the hearing on the motion held before United States District Court Judge Charles Wolle in September 1995.

In his final order on pretrial motions, Judge Wolle concluded that (1) the interrogation was not coercive, (2) Constantino's statements were voluntary, and (3) during the investigation Constantino waived his right to remain silent and his right to counsel. The judge denied the motion to suppress and the case proceeded to trial.

Johnson testified at Constantino's federal trial. Before Johnson testified, the federal prosecutors failed to give Constantino's lawyer copies of Johnson's grand jury testimony and Johnson's notes of the February 23, 1995, interrogation. This failure constituted a Jenks Act violation and resulted in a mistrial. Constantino then entered an *Alford* plea on November 16, 1995, and was released from custody.

One day after his release from federal custody, Constantino was arrested and charged in state court with first-degree robbery of the Coralville Bonanza restaurant. In February 1996, District Judge Larry Conmey suppressed Constantino's statements made during the February 23, 1995, interrogation. The judge determined that Constantino made an unambiguous request for counsel during the interrogation, after which the detectives should have terminated the interrogation and Constantino should have been provided with an attorney. Judge Conmey did not rule on the voluntariness of Constantino's statements made during the interrogation. A week after the judge's ruling, a jury acquitted Constantino of the robbery charge.

On February 13, 1998, Constantino filed a civil suit against Johnson and the City of Coralville. In the suit, Constantino alleged that he was subjected to false arrest, false imprisonment, and malicious prosecution, among other wrongs, as a result of his interrogation, arrest, and prosecution for the robberies. Several days before the suit was filed, Constantino's lawyer sent a

demand letter to the City, detailing the allegations of misconduct against Johnson.

After reviewing the petition, Coralville's chief of police, Barry Bedford, determined it contained allegations of wrongdoing significant enough to warrant an internal affairs investigation. On February 20, 1998, Chief Bedford advised Johnson of the lawsuit and told him an internal affairs investigation into his conduct was warranted.

The City of Coralville settled with Constantino less than six weeks after the suit was filed, without filing an answer. The settlement upset Johnson and prompted him to file suit against the City, its insurer, and various other defendants because Constantino's suit was settled without an answer or trial. *See City of Coralville v. Iowa Dist. Ct.*, 634 N.W.2d 675, 677 (Iowa 2001).

On April 6, 1998, shortly after the City's settlement with Constantino, Chief Bedford ordered an internal affairs investigation of Johnson. The chief designated Lieutenant Ron Wenman as the primary investigator. During the investigation, Johnson responded to allegations in writing and in person. Wenman completed his final report on January 20, 1999.

In his April 6, 1998 order, Chief Bedford listed fifteen allegations of misconduct against Johnson, all based on claims made by Constantino in his lawsuit against Johnson and the City. The chief added two allegations. Wenman added three allegations, bringing the total to twenty.

Wenman's report sustained thirteen allegations, sustained in part one allegation, and did not sustain six allegations. The report recommended that the chief discharge Johnson. Chief Bedford approved the report on January 22, 1999. On the same day, the chief notified Johnson that he—the chief—intended to discharge him.

On March 29, 1999, Johnson received a written notice of discharge.

Johnson appealed the discharge to the Civil Service Commission pursuant to Iowa Code chapter 400 (1997). In November 1999, the Commission upheld the discharge. Several days later, Johnson appealed the Commission's ruling to the district court, pursuant to Iowa Code section 400.27.

In February 2001, the district court heard several days of testimony. Several months later, the court ruled. Of the fourteen allegations that had been sustained in Wenman's final report, approved by the chief and upheld by the Commission, the court sustained only three of them—allegations 6 (sustained in part), 18, and 19.

Allegation 6 stated, "Officer Johnson untruthfully reported in official reports and sworn testimony, misrepresenting statements by Michael Constantino." The district court divided this allegation into eight subparts, A through H. It sustained only subpart "A," which related to Johnson's report of Constantino's alleged request for an attorney.

Allegation 18 related to a search warrant Johnson obtained on November 30, 1994. The district court concluded that Johnson did not properly document the search warrant procedure.

Allegation 19 related to alleged "offers of leniency." The district court found "many examples of promises of leniency made by Johnson during the interrogation" of Constantino, but did not find these were "improper offers of leniency." The court concluded that "the offers, even though they did not render the confession involuntary, were made and were not disclosed." The court therefore sustained the allegation.

The district court ordered a thirty-day suspension, effective March 29, 1999. The

court further ordered Johnson's reinstatement to his former position as police officer, retroactive to April 29, 1999.

The Commission appealed; Johnson cross-appealed.

## II. Issues.

The Commission disputes the district court's factual findings. It contends the evidence shows Johnson was untruthful in reporting and testifying during a criminal investigation. Rather than addressing each allegation individually, as the district court did, the Commission addresses a number of general areas in which it claims Johnson was untruthful. These include the following: (1) request for counsel, (2) promises of leniency, (3) documenting the search warrant, and (4) internal affairs. The Commission contends, "[t]he issue that has come front and center on this appeal is: Was Britton Johnson honest and truthful when he made reports and gave testimony concerning the interrogation and investigation of Michael Constantino?"

The Commission concludes that based on the record before it, the district court erred by reducing the sanction imposed against Johnson from termination to a thirty-day suspension.

In his cross-appeal, Johnson contends we should reduce or eliminate the discipline the district court imposed.

The appeal and cross-appeal come down to (1) whether Johnson was untruthful, and (2) if so, what discipline is warranted.

## III. Scope of Review.

■ We review the district court's decision de novo. Iowa Code § 400.27; *Dolan v. Civil Serv. Comm'n*, 634 N.W.2d 657, 662 (Iowa 2001). We give weight to the district court's findings but are not bound by them. *Id.* Our review is confined to the record made in the district court. *Id.* We do not receive new evidence, and we limit our review to the same issues raised in the district court. *Id.* We "*independently* construe the factual record as a whole to determine if the officer's discipline was warranted." *City of Des Moines v. Civil Serv. Comm'n*, 513 N.W.2d 746, 748 (Iowa 1994).

## IV. Applicable Law.

■ A chief of police may remove, demote or suspend a police officer for neglect of duty, disobedience of orders, misconduct or failure to properly perform duties. Iowa Code §§ 400.18, .19. Misconduct has no fixed meaning, but is a broad term that "includes relatively minor or innocuous behavior ... or more flagrant and injurious breeches of decorum." *Sieg v. Civil Serv. Comm'n*, 342 N.W.2d 824, 829 (Iowa 1983). A chief's suspension or dismissal of an officer must be for "conduct detrimental to the public interest." *City of Fort Dodge v. Civil Serv. Comm'n*, 562 N.W.2d 438, 440 (Iowa Ct.App.1997) (citation omitted).

■ A police officer

does not have a constitutional right to his employment and is subject to reasonable supervision and restriction by his supervisors so proper discipline may be maintained and the activities of officers do not disrupt or impair their public duties. Rules and regulations are necessary to maintain order and discipline among officers and to ensure and improve public service. The purpose of these rules is not merely punitive; it is also to protect the public. Since peace officers are charged with a public trust, the public has every right to expect these officers to conduct themselves with good character, sobriety, judgment and discretion. Police departments are

akin to paramilitary organizations, and discipline must be strictly enforced.

*Sieg,* 342 N.W.2d at 829 (citations omitted).

The image presented by police personnel to the general public "is vitally important to the police mission." *City of Fort Dodge,* 562 N.W.2d at 440 (citation omitted). Additionally, such image "also permeates other aspects of the criminal justice system and impacts its overall success." *Id.* For these reasons, "police officers must earn and maintain the public trust at all times by conducting themselves with good judgment and sound discretion." *Id.*

 Grounds justifying discipline of an officer are not confined to the violation of a criminal statute or a departmental rule. *Eilers v. Civil Serv. Comm'n,* 544 N.W.2d 463, 466 (Iowa Ct.App.1995). Prior violations of rules may be considered in determining whether the cumulative effect of an officer's misconduct is sufficient to warrant discharge. *City of Fort Dodge,* 562 N.W.2d at 440.

### V. Untruthfulness.

The egregiousness of Johnson's untruthfulness regarding promises of leniency he made during the interrogation of Constantino, together with Johnson's prior violations, convinces us that the proper discipline in this case is termination, a matter we discuss later in this opinion. We limit our discussion here to the promises and Johnson's subsequent statements regarding those promises.

 An officer may tell a suspect it is better to tell the truth. *State v. Hodges,* 326 N.W.2d 345, 349 (Iowa 1982). But where an officer tells a suspect what advantage is to be gained or is likely from making a confession, ordinarily the officer's statements become promises or assurances, rendering the suspect's statements involuntary. *Id.*

 The transcript of the interrogation is replete with Johnson's statements of leniency, as the following excerpts from the interrogation show:

JOHNSON: . . . [Y]ou got a hell of a lot to lose.

CONSTANTINO: Yes.

JOHNSON: Yes you do, and life can go on or life can stop as you know it, and it depends on you. I mean you can write your own chapter on how you want this book to end, but this book is gonna end.

. . . .

JOHNSON: You're gonna be on a fast track to hell, I'm telling you. This game is up. And if you want to sit here and play this game, fine, I'll play this game, Mike will play this game and we'll play this game until you get tired of it. But the train is picking up speed every second, and you're on it, and you won't be able to get off. We are giving you a chance to get off.

. . . .

JOHNSON: And we haven't even gotten to the serious part of it yet. But it's gonna take you telling us something to make us think that you are willing to work with us, and talk to us and help us, and if you don't do that, life as you know it is over. I'm not gonna tell you anything that we know until we want you to know about it.

. . . .

JOHNSON: We did a search warrant at your place. We've got statements. You're about five seconds away from taking a trip. We're giving you a chance. You're the first person we're talking to, and we want some cooperation from you on this and some other stuff more serious than this, and if we

don't get it, you won't recognize yourself when you get out of jail.

. . . .

JOHNSON: Ok. You're not the person we want the most. Now, I'm telling you this, and you can take it to the bank. You don't know me from Adam, I know that, and I could be the word's best bullshitter. I'm not bullshitting you. You can take this to the bank. You either work with us and help us, or you're gonna be buried by what we write up.

. . . .

JOHNSON: Alright, so now I'm gonna turn this conversation over to you for a little bit, and I want you to give us some indication that you are gonna help us, that you are gonna work it out with us, and we'll do everything we can to help you, but like I said, if you bullshit us, we're gonna start writing tickets until we get writer's cramp.

. . . .

JOHNSON: . . . It's over. Now, you can write how you want it to end, you don't have to, you don't have to be involved with the federal system. Plain and simple.

. . . .

JOHNSON: Life as you know it is over. Now, it can maintain some semblance of reality, and it can maintain its normal course, slightly. You keep f—ing around, and life as you know it is gone, and you're not going to see your kids growing up, and you are not going to be around Hope [Constantino's wife].

. . . .

JOHNSON: It doesn't matter to me. You're the only one that has no criminal record. You're the only one that's got a family. You're the only one that's got a house. You're the only one that's got a car. You're the only one.

. . . .

JOHNSON: . . . We're not going to talk to Ricky, we're not going to talk to Bobby, we're not going to talk to Theo, we're talking to you, because you got the most to lose. You help us, and we'll take care of you.

. . . .

JOHNSON: . . . You tell us about it, and we'll help you out, but you gotta do that. I can't make you.

. . . .

JOHNSON: . . . I'm giving you a key to a door, man, you can walk out of here today.

. . . .

JOHNSON: . . . Nobody here wants you. He said he will make that go away. We don't want you.

. . . .

JOHNSON: What I'm saying is, I don't want you. . . . You can walk out of here, you can go home. Nobody sees your car parked in that back lot, nobody knows you're in here talking.

. . . .

JOHNSON: You can get out of here today. . . . Or, you can go to jail.

. . . .

JOHNSON: . . . You can walk out of here. You can go home to your family, but [I] need something from you, something I already know that's going to show me that you're willing to help us, and that can go away. I don't want you. You have no criminal record. We can keep it like that. I don't want you, but I'll take you, and you'll have one hell of a criminal record when I'm done.

. . . .

At the final pretrial conference hearing in federal court, Johnson testified as follows:

Q. Did you offer him any benefit in exchange for cooperation? A. No.

Q. Did you tell him that you weren't going to charge him with anything? A. No.

. . . .

Q. Do you remember saying to Michael Constantino, "If you talk to us, you've got no criminal record and you can keep it that way?" Do you remember telling him that? A. No sir.

Q. Didn't you promise him that if he would talk to you, he would have no criminal record? A. No sir.

Q. You deny that? A. Yes, sir.

Q. You specifically for sure never told him words anything like, "You've got no criminal record, you can keep it that way?" A. I don't recall saying that.

. . . .

Q. Do you remember saying to him, "If you cooperate with me, I'll give you the key to the door, and you can walk out of here today?" A. No, sir.

At the suppression hearing in state court, Johnson testified as follows:

Q. When you made statements about writing charges or getting writer's cramp, did you ever tell the defendant that you weren't going to file any robbery charges in relation to those statements? A. Never.

Q. Did you ever promise a specific advantage to the defendant in return for his cooperation? A. Never.

We agree with the Commission's characterization of these excerpts: "In spite of the extensive number and nature of such promises, Johnson, when asked, did not merely state he did not remember making such promises. Instead, . . . he flatly denied making them when the transcript

shows he had repeatedly done so." In short, we find that Johnson was untruthful in these proceedings despite being under oath.

Officers understand their obligations about offers of leniency and their obligation to disclose such offers in their reports to superiors. Significantly, from the very beginning, Johnson concealed from his superiors his promises of leniency to Constantino. His report deletes any mention of such promises and merely describes the interrogation this way:

We also said that we were not after him as being the main person responsible for the robberies. We indicated to him that we were wanting his cooperation. He said to us that he was going to cooperate, again 100%.

As mentioned, Johnson learned of the audiotape of the interrogation after he completed his report. This was before the proceedings in question took place. He therefore had access to the audiotape before testifying. It is inconceivable to us that Johnson would neglect to listen to the audiotape and read the transcript before testifying in proceedings where the promise of leniency was a primary issue. We can thus reasonably assume that someone in Johnson's position would have had a keen interest in the audiotape and transcript and would have familiarized himself with their contents before testifying. At the very least, we think prosecutors would have suggested to Johnson that he listen to the audiotape and read the transcript.

As mentioned, the federal court ruled that Constantino's statements were voluntary, and his will was not overborne or overcome by the officers' conduct. However, at one point during the final pretrial conference hearing, Judge Wolle expressed concern about Johnson's and even Bowers' credibility:

[O]ne thing that ... is troublesome for me ... is that the witness Johnson and the witness Bowers both gave testimony about what took place that we then heard an audiotape about, and much of what they remembered and gave testimony about was inconsistent with the audiotape, and does that also reflect on how much reliability we can place on their description of what took place that wasn't taped ....[I]t seems to me that their credibility is affected by the fact that they had very poor memory and, frankly, that their written report is inconsistent with the tape we already have.

Judge Wolle's reference to the officers' "poor memory" relates to two points covered in the interrogation of Constantino. At one point during the interrogation, Detective Smith entered the room with a "booking sheet." Smith was investigating Constantino relative to burglaries at North Park Mall, where Constantino previously had been employed in maintenance. During the interrogation, the following exchange took place:

SMITH: ... Michael, this is what you're facing right there, there is your booking sheet, okay?

CONSTANTINO: What am I robbing?

SMITH: Okay, Michael.

CONSTANTINO: And what am I burglarying?

. . . .

JOHNSON: Do you understand that this is not bullshit?

CONSTANTINO: Yes.

JOHNSON: We are not playing games.

SMITH: Notice your bond, okay?

CONSTANTINO: I don't, I can't see that.

SMITH: Okay, you want that to go away, talk to the man. Right now I've got all these, okay? You talk to this man, I can make this go away today.

At the final pretrial conference hearing before Judge Wolle, Johnson testified he did not remember the booking sheet. Even after listening to the audiotape, Johnson testified he did not recall the booking sheet.

At another point during the interrogation, Bowers informed Constantino his car was going to be searched:

BOWERS: ... I've also got a search warrant for your car, and I am going out there right now, and I'm going to go through your car with a fine[-]tooth comb with an evidence technician.

CONSTANTINO: That's fine.

BOWERS: And you better think about what you are going to say when I get back and

CONSTANTINO: If you want to search my car, if you want to search my car, I want to be there, and I want....

BOWERS: You ain't going to be shit. ·

Johnson was present when this exchange took place. At the final pretrial conference hearing before Judge Wolle, even after listening to the audiotape, Johnson testified he did not remember the vehicle search.

We find Johnson's claimed memory lapse as to both instances unbelievable in light of the fact that he had access to the audiotape before the hearing. Additionally, Johnson had ample reason to feign a loss of memory. As the Commission points out, "the booking sheet was the list of charges that potentially stood to be 'resolved' if Constantino agreed to cooperate" and thus "would have been a classic case of the 'bait' for a promise of leniency."

## VI. Discipline.

We turn now to the question of the appropriate discipline in this case. Truth-

fulness in the performance of duty is at the core of this case. The importance of this is underscored in Chief Bedford's notice of discharge to Johnson:

> Honesty and truth telling is a core ethical value in our society. Citizens demand that those who are given extensive power and authority over them abide by high standards of integrity and credibility. The integrity of any organization is dependent upon the personal integrity of each individual member. This is even more important in the area of law enforcement. A law enforcement organization must never tolerate any less than fully truthful behavior from officers in the performance of their duties. Unfortunately, you have chosen repeatedly to be untruthful and withhold information in the course of your official duties. Your blatant disregard for following departmental policies and your lack of professionalism leads me to conclude that I can no longer depend upon your judgment or your truthfulness.

■ By his actions, Johnson, a veteran of almost thirty years who should know better, not only withheld information when he failed to disclose in his report that he made promises of leniency to a suspect but also lied about it in court proceedings. His lack of credibility was so obvious that a federal district judge commented on it. In these circumstances, to allow Johnson to remain on the job would potentially taint any investigation in which he might be involved. No police department should be put in that position. Nor should citizens be subjected to an officer who has no compunction about stretching the truth concerning his conduct involving the citizen's constitutional rights. Truly, Johnson's conduct was detrimental to the public interest.

In a number of cases, courts have found discharge to be an appropriate sanction where a police officer has been untruthful. *See, e.g., Valio v. Bd. of Fire & Police Comm'rs*, 311 Ill.App.3d 321, 244 Ill.Dec. 136, 724 N.E.2d 1024, 1032 (2000) (sufficient cause existed to justify officer's discharge where officer violated departmental rules of conduct by lying during departmental investigation); *Merrifield v. Illinois State Police Merit Bd.*, 294 Ill.App.3d 520, 229 Ill.Dec. 255, 691 N.E.2d 191, 199 (1998) (sufficient cause to justify officer's termination where male officer knowingly maintained an ongoing romantic relationship with a female convicted felon and deliberately misstated the status of the relationship to fellow officers); *Moran v. Civil Serv. Comm'n*, 120 Ill.App.3d 884, 76 Ill.Dec. 367, 458 N.E.2d 1021, 1026–27 (1983) (affirming discharge of officer who admitted he gave false testimony under oath before a federal grand jury); *Slayton v. Bd. of Fire & Police Comm'rs*, 102 Ill.App.3d 335, 58 Ill.Dec. 99, 430 N.E.2d 41, 43–44 (1981) (termination upheld where officer admitted making false representations while off duty to an officer from a neighboring town, and admitted the representations were intended to protect a friend who had just committed a crime); *Kupkowski v. Bd. of Fire & Police Comm'rs*, 71 Ill.App.3d 316,, 27 Ill.Dec. 407, 389 N.E.2d 219, 225–26 (1979) (officer's dismissal justified where officer involved in one-car accident denied orally and in writing knowledge of the resulting damage); *Merritt v. Council Bluffs Civil Serv. Comm'n*, 458 N.W.2d 867, 869–70 (Iowa Ct.App.1990) (termination an appropriate sanction where officer "willfully sought to hide the fact that he was continuing to live with his family in Omaha throughout his employment with the Council Bluffs police force," despite residency requirement of which he was informed during orientation); *Benvignati v. Civil Serv. Comm'n*, 106 Pa. Cmwlth. 643, 527 A.2d 1074, 1076 (1987) (undisputed facts established course of

conduct providing cause for officer's dismissal where officer knew or should have known at the time he signed a search warrant he did not personally participate in surveillance).

Moreover, Johnson is no stranger when it comes to misdeeds in his official capacity as a police officer. His prior disciplinary history with the Coralville Police Department includes six incidents. In 1986, Johnson received a written reprimand of his actions during a traffic stop. In 1987, he received a verbal reprimand for his response to a citizen complaint. In 1989, he received a written reprimand for conducting an unreasonable search and seizure. In 1997, he received a letter of warning regarding a high-speed pursuit, and another regarding an automobile accident to which he contributed.

In 1990, Johnson received a written reprimand and five-day suspension for his role in an incident involving the removal of a memorandum from the police department without authorization. In that incident, Johnson's truthfulness was also called into question. In a written reprimand of Johnson, Chief Bedford wrote:

> [T]he story you gave concerning how you came to be in possession of the memorandum is both incredible and unbelievable. Even when face to face with the supervisor and his assertion of fact, you failed to be candid or truthful about the circumstances in question.

Finally, in 1981, Johnson was discharged by the police chief of the Clinton Police Department for using excessive force in arresting a suspect. On appeal, this court found Johnson had used excessive force, reversed the district court's imposition of a two-year suspension, and concluded that discharge was appropriate under the circumstances. *Johnson v. Civil Serv. Comm'n*, 352 N.W.2d 252, 258 (Iowa 1984).

Given the seriousness of Johnson's misconduct and his prior disciplinary record, we have no hesitation in concluding Johnson should be discharged from his position as police officer with the Coralville Police Department. Accordingly, we reverse the decision of the district court and remand for an order reinstating the Commission's termination decision. Our decision on appeal disposes of the cross-appeal.

**REVERSED AND REMANDED WITH DIRECTIONS.**