Lowy, David A., J.
This action arises from the decision of an arbitrator reinstating, with full back pay and benefits, Lt. Jerry Enos (“Enos”) and Sgt. K. Ricky Thompson (“Thompson”) as supervisoiy employees in a corrections institution, following their termination. Their termination was based on the claim that they, as webmasters of the defendant Essex County Correctional Officers Association’s (“ECCOA”) website, had permitted, condoned or encouraged others to post racially and sexually harassing messages on the website and themselves made harassing and otherwise offensive comments on the website. The Essex County Sheriffs Department (“the Department”) appeals from the arbitrator’s decision, arguing the decision violates public policy and the arbitrator exceeded his authority. For the reasons set forth below, after a hearing and review of the record, the Department’s Motion for Judgment on the Pleadings will be ALLOWED and the arbitrator’s award VACATED.
BACKGROUND
Based on the arbitrator’s decision, the court infers that the arbitrator found the following facts.
The Department and ECCOA are parties to a collective bargaining agreement (“CBA”) that sets forth the wages, hours, terms and conditions of employment of certain full-time and regular part-time employees of the Department, including Enos and Thompson. The Department has jurisdiction over a variety of correctional facilities in Essex County, including the Middleton facility where Enos and Thompson were employed prior to their termination on October 3, 2007.
The CBA provides, in relevant part, that the Sheriff “shall have the right to discipline, demote, or suspend any employee for just cause subject to the grievance procedure outlined in Article 32 herein.”
In 1994, Massachusetts Governor William Weld appointed State Representative Frank G. Cousins, Jr. (“Sheriff Cousins or Cousins”) to be Essex County Sheriff. The Sheriff is African-American. ECCOA was formed in 1998. The relationship between ECCOA and Sheriff Cousins was tense nearly from the beginning of the relationship. The parties point to various incidents which each claims contributed to the deteriorating relationship between ECCOA and the Department.
In approximately 2001, ECCOA established a website. In 2003, Thompson was elected as ECCOA’s Recording Secretary and began to serve as the administrator of the website. Thompson alone had the password to the website, and only he had the ability to edit the website. In 2004, ECCOA redesigned the website to include an electronic bulletin board. The electronic bulletin board was established, in part, to frustrate the Department’s contractual ability to remove postings that it considered to be objectionable from ECCOA’s traditional corkboard, which it had previously hung at the jail.[1]
The electronic bulletin board was open to anyone who both registered with the website and agreed to the website’s terms of use by clicking on a standard user agreement form.[2] After successful registration anyone could post content to the ECCOA electronic bulletin board. ECCOA, Enos, and Thompson all agree that Enos and Thompson had ultimate authority over the electronic bulletin board; that is, they could modify, edit, or take down any post and they could ban individuals from access to the electronic bulletin board.
Superintendent of the Middleton Facility, Michael Marks (“Marks”), testified at the arbitration that the Department began monitoring the electronic bulletin board in 2004 because Marks received reports of *488 offensive postings on the bulletin board. Marks referred to some of the offensive posts which began in July 2004, which include the following:
Author: Ryan D.
I have just read in the paper that the courts will be using cameras at times for bail reduction hearings. I have concerns that this will reduce our current transportation department/teams I hope that we stick to the current level of teams that are out there? By keeping them it should allow them to work safely and also eliminates the Sheriff from reassigning them for his purposes. I hope this makes some sense.
Author: LoosescrewsB4
Re-assign them??? If he could he would post them at Intersection with his signs strapped to their backs.
Author: Jerry Enos
Strap-ons, now that’s the future of corrections. No offense, of course, to the junior captain.
Author: joec
My main thoughts are, that there are five types of people in this world:
1. The Jews that got marched into the death chambers (our officers)
2. The Dictator (Hitler) that ordered it (you know who)
3. The Nazi-SS that pushed the Jews in (Dictator’s supporters)
4. The people that put on blinders and did nothing (any one that does nothing)
5. The few that rebelled and ATTACKED the nazi’s and saved some Jews lives, (us — you know who you are)
Author: Jerry Enos
We have over 6,000 hits on our discussion forum, yet few people are sharing their thoughts. You all have a voice and it should be heard. Whether you agree or disagree with what is being said, you opinion counts. I would ask you to take the time to jot down a few thoughts about what you are reading
The Department took no disciplinary action with respect to the above posts because it “did not want to be seen retaliating during the election cycle.” Marks testified, “we hoped it would stop at the end of the election cycle.”
The postings on ECCOA’s electronic bulletin board became more racist in 2005. Marks referred specifically to a lengthy posting by “Only the Shadow Knows” on August 21, 2005, which listed ways of committing suicide under the heading “suggestions for sell-outs (and Frank).” Marks also referred to postings that responded to the suicide suggestions, one of which stated, “WOW Shadow, you are one sick motherfucker and I love you for it.” Another posting in response to the suicide suggestions stated:
The Shadow is not one sick motherfucker, he is THE SICKEST MOTHERFUCKER!!!
And to prove it, I shall show you.
Question: What do you do to the bodies of such shit bags after they off themselves?
Answer: BAR-B-QUEÜ!
[extensive instructions regarding the preparation of the human body for bar-b-que]
A particularly offensive posting appeared on August 6, 2005 in response to postings critical of Sheriff Cousins, his management style, his supporters, and in response to the previously posted question “CAN ANYONE HELP OUT THERE!!!” It read as follows:
Yeah, there was someone who can help, but James Earl Ray is DEAD!
Another offensive posting that appeared on August 6, 2005 referenced the discharge of Lieutenant Kevin O’Leary[3] in 1998 and stated:
Author: Only the Shadow Knows
Does anyone remember Kevin O’Leary???
He was a SOLID LT. In the Voke 1. He got railroaded because of an email. Well, does anyone remember that email???
Does anyone wish it really happened???
Does anyone WANT to KNOW where that email originated . . .
Someone does, but. . .
ONLY THE SHADOW KNOWS!!!
An August 13, 2005 posting focused on the Department’s African American Director of Human Resources.
Author: sameoldthing
I saw Willy that House slave smith on the site once in his office I’m sure his black ass runs to the sheriff crying there at it again wha wha wha little bit** always looking out for the master who thinks he’s white because he lives in whitevill take a look in the mirror you spineless fu** he even had to marry a white woman nice trophy you think your better off with Ohara the sword s*****.
On August 28, 2005, “Rob” responded to the thread as follows:
Hey, sameold why don’t you move down south and take your sheets with you. Im on this site to better our union not listen this . . .
In response to these postings, in early autumn 2005, the Department contacted the District Attorney for investigation of hate crimes. The Department “turned over the same information to the Federal Bureau of Investigation (FBI) in October 2005.” Sheriff Cousins initiated a suit at the Massachusetts Com *489 mission against Discrimination (“MCAD”) against ECCOA and various individuals. In 2006, the Department brought those charges against ECCOA, Enos, Thompson, and a series of “John Does” it alleged were posting under pseudonyms. On August 16, 2007, the MCAD issued a finding of probable cause.[4]
Marks testified that beginning in 2005, the Department began the process of disciplining employees for making posts that disrupted the workplace and/or defamed individuals. The Department suspended Pam Patterson for 30 days because of a series of postings she made which claimed that a co-worker had “slept her way to the top, all she did was one-night stands, and trained other females to do the same.” In February 2006, the Department discharged Joseph Curran because, in its words, “you identify Hitler as the Sheriff, the Jews as the Correctional Officers, the Nazi generals as the Department’s deputies and captains, and another group, including yourself as ones who may attack the Nazis.” The Department discharged Brian Mason for postings on the electronic bulletin board, and suspended Gina Mc-Guiness for 30 days for her posting which implied that a Deputy had engaged in a sexual act with another staff member in order to gain professional advancement.
On October 3, 2007, Special Sheriff Thomas Goff sent letters of discharge to Enos and Thompson. The letters were virtually identical and stated that on September 18, 2007, a disciplinary hearing was noticed before Special Sheriff Goff pursuant to the CBA. The letters of discharge stated the disciplinary hearing was precipitated by allegations that: (1) Enos and Thompson had control over the ECCOA’s sponsored web site and the ability to remove or prevent from being posted hostile, discriminatory, harassing and disruptive web site postings; and (2) Enos and Thompson failed to remove, or timely remove the offending postings resulting in disruption or the reasonable anticipation of disruptions to the effective and efficient administration of the Department. Special Sheriff Goff reviewed the postings that the Department considered hostile, discriminatory, harassing and disruptive, and referenced 18 specific postings. The 18 postings include the ones referenced previously. Special Sheriff Goff found that the 18 specific postings “are discriminatory, harassing and/or disruptive and should have been timely removed” and “represent nearly three years of the Union’s tolerance of racially harassing and hostile attacks against the Sheriff and other employees.” Special Sheriff Goff determined that Enos and Thompson’s failure to remove the offensive postings violated the CBA, the employee handbook and the policies relating to the prevention and elimination of harassment in the workplace and consequently, that there was just cause for discharge. Special Sheriff Goff noted that as supervisory employees, Enos and Thompson were required to implement the Department’s policies and ensure compliance with all policies from the officers they supervised.
The arbitrator concluded that notwithstanding the extensive testimony, voluminous documentary evidence, and lengthy legal argument, the Department did not meet the standard of just cause pursuant to Article 28, Sec. 2 of the CBA. Specifically, the arbitrator found that the Department “did not comply with the fundamental just cause principle of advance notice to bargaining unit members that their conduct did not conform with Departmental expectations concerning their conduct or timely discipline.” The arbitrator found that while Enos and Thompson were discharged “because they themselves posted harassing, vulgar, threatening, sexist, and/or racist messages on the forum, because they encouraged others to post such messages, and because they failed to remove, edit, or take down such messages despite their acknowledged ability to do so” there was “insufficient evidence on the record ... to conclude that Enos and Thompson either knew or should have known that their conduct — or lack thereof — would lead to their discharge."
According to the arbitrator, the Department’s argument that Enos’s and Thompson’s misconduct was sufficiently serious, threatening to the safety of their coworkers and Sheriff Cousins, and destructive of the confidence in the Department was undercut by the fact that the Department was aware of the conduct since 2004 and failed to discipline Enos and Thompson for approximately three years. While the Department’s reasons for delaying discipline or discharge may have been valid, to delay discharge for almost three years served “to lull [Enos and Thompson] into a reasonable belief that their conduct would not cause them to lose their jobs.” The arbitrator found, “ [s]uch a delay resulted in what may reasonably be viewed as cumulative discipline which does not comport with the requirements of just cause.”
The arbitrator found that Enos’s and Thompson’s conduct exhibited “their desire to avoid Departmental interference with their ability to post messages as well as a desire to avoid Departmental discipline for doing so,” however, that conduct did not “demonstrate their knowledge that to permit others to post offensive messages on the electronic bulletin board would subject them to discharge.” The arbitrator acknowledged there can be “no doubt that at least since 1998, the Department has taken serious disciplinary action against employees who have posted what by any reasonable standard would be considered offensive, threatening, sexist and/or racist material."
Additionally, the discipline of employees including, but not limited to, Patterson, McGuiness, Curran, and Mason may have sent the message to other employees that the Department would not tolerate individuals posting offensive messages on the electronic bulletin board. The discipline of other employees for their postings “sent no message to Enos and Thompson that their allowance of such messages to be posted on the electronic bulletin board or their failure to edit such *490 messages, or even their encouragement that such messages be posted in the first place would lead to their discharge.” In fact, the arbitrator found that the Department’s failure to discipline Enos and Thompson while it disciplined and discharged their coworkers “provided reasonable assurance to Enos and Thompson that the Department would not discharge them for their use of or management of the electronic bulletin board.”
With respect to this issue of notice, the arbitrator concluded the criminal investigations concerning the postings on ECCOA’s electronic bulletin board did not constitute notice to the Union officials who acknowledged control over the electronic bulletin board that their failure to remove offensive postings would jeopardize their employment status. Marks testified that from 2004 to 2007, he met with Enos and told him on multiple occasions that the website was inappropriate and the information on the site was ridiculous. The arbitrator credited Marks’s testimony, but pointed to Marks’s acknowledgment that he did not tell Enos that he or Thompson would be disciplined for the postings made by others. The arbitrator also credited the testimony of John Russell (“Russell”), Deputy Superintendent (now retired), who stated that on 50 or 60 occasions he and Enos discussed the electronic bulletin board. Even though there were multiple meetings and/or discussions with at least Enos about the electronic bulletin board and its content, the arbitrator found that there was no written record that such conversations rose to the level of “counseling sessions.” The arbitrator also noted that Enos’s and Thompson’s personnel files were devoid of any mention of such counselings or of discipline related to their responsibility with respect to the electronic bulletin board. “Of great significance in this case is the acknowledgment of both Marks and Russell that at no time did they ask Enos or Thompson to take down any postings which they deemed to be offensive, threatening, racist, or sexist.” Marks testified that, “we did not know if we had the authority” to so demand.
The arbitrator determined that the discharges of Enos and Thompson were not for just cause and awarded them reinstatement to their former positions and “any wages and benefits which they may have lost as a result of their unjust discharges . . .”
DISCUSSION
The role of the court in reviewing an arbitrator’s award is limited. Sheriff of Suffolk County v. AFSCME Council 93, Local 419, 67 Mass.App.Ct. 702, 704 (2006), citing City of Lynn v. Thompson, 435 Mass. 54, 61 (2001). When parties agree to arbitrate a dispute, the arbitrator’s decision is accorded great weight by our courts. Id., citing School Dist. of Beverly v. Geller, 435 Mass. 223, 228 (2001). A court is “strictly bound by an arbitrator’s findings and legal conclusions, even if they appear erroneous, inconsistent, or unsupported by the record at the arbitration hearing.” City of Lynn, 435 Mass, at 61. The strong public policy favoring arbitration requires the courts to uphold an arbitrator’s decision even where it is wrong on the facts or the law, and whether it is wise or foolish, clear or ambiguous. City of Boston v. Boston Police Patrolmen’s Ass’n, 443 Mass. 813, 818 (2005). If the dispute concerns a collective bargaining agreement with an arbitration provision, the arbitrator’s decision is subject to judicial review as provided in G.L.c. 150C,§11.
Extreme deference to the parties’ choice of arbitration does not require the court to turn a blind eye to an arbitration decision that violates the law, offends strong public policy or exceeds the authority of the arbitrator. Boston Police Patrolmen’s Ass’n, 443 Mass. at 818; see G.L.c. 150C, §11 (a)(3) (Superior Court judge “shall” vacate arbitration award where “the arbitrators exceeded their powers or rendered an award requiring a person to commit an act or engage in conduct prohibited by state or federal law”). Whether an arbitrator has acted beyond the scope of authority conveyed to him is always open to judicial review. AFSCME Council 93, Local 419, 67 Mass.App.Ct. at 706, quoting Local 589, Amalgamated Transit Union v. Massachusetts Bay Transp. Auth., 392 Mass. 407, 410-11 (1984). Pragmatically, arbitrators may exceed the scope of their authority in two ways: (1) they may issue a decision that, directly or indirectly, requires a party to commit an act or engage in conduct that is prohibited by state or federal law; and (2) they may issue an award as to a matter or in an amount that, under the terms of the contract they were appointed to interpret, is expressly beyond their authority as arbitrators. Adam Assoc., Inc. v. William, 22 Mass. L. Rptr. 389, 391 (Mass.Super. 2007) (Gants, J.) (internal citations omitted). Here, the Department seeks to vacate the arbitration award on the grounds that the award violates strong public policy and the arbitrator exceeded his scope of authority.
1. The Arbitrator Exceeded his Scope of Authority
In determining whether an arbitrator has exceeded the authority granted to him by contract, judicial review focuses on the language of the contract that grants or limits the arbitrators’ authority. Id., 22 Mass. L. Rptr. at 391. It is clear that an “arbitrator may not ignore the plain words of [a] contract.” AFSCME Council 93, Local 419, 67 Mass.App.Ct. at 706, quoting Grobet File Co. of America v. RTC Sys., Inc., 26 Mass.App.Ct. 132, 134-35 (1988). If, on review, the court finds that an arbitrator has exceeded his authority in fashioning an award, the court is required to vacate it. Id., quoting Geller, 435 Mass, at 228 (quotations omitted).
The power and authority of an arbitrator is ordinarily derived entirely from a collective bargaining contract, and the arbitrator violates his obligation to the parties if he substitutes his own brand of industrial justice for what had been agreed to by the parties in that contract. Id. An arbitrator’s award is legitimate *491 only so long as it draws its essence from the collective bargaining agreement that he is confined to interpret and apply. Id. However, “(i]f there is room for doubt or interpretation on the question, then the issue properly lies within the broad authority conferred upon arbitrators of civil disputes.” Id., quoting Grobet File Co. of America, 26 Mass.App.Ct. at 135.
The Department argues that the arbitrator modified the CBA, he failed to draw his award from the essence of the contract, and dispensed his own brand of industrial justice. By requiring the Department to provide “advance notice” to employees that their conduct could lead to their discharge, the Department argues the arbitrator added a requirement to the CBA that was not bargained for. Additionally, by adding a requirement of advance notice, the arbitrator exercised his authority in direct contradiction to the language of Article 4 of the CBA. Article 4 of the Agreement states that “the Employer . . . reserves the right to decide whether, when, and how to exercise its rights and prerogatives, whether or not enumerated in this Agreement. Accordingly, the failure to exercise any right shall not be deemed a waiver.” The Department also points to Article 32, Section 4 which specifically prohibits the arbitrator from “changing], modify[ing] or alter(ing) any provisions of this Agreement . . . unless clearly required by the application of an express provision of [this] Agreement.”
The CBA at issue here does not provide for any progressive discipline, nor is there a requirement that an employee receive advance verbal or written notice that certain conduct may result in discharge. Some collective bargaining agreements set out levels of progressive discipline for employee misconduct. The sequence of discipline in such policies often includes the following levels: verbal warning, written warning, written reprimand, suspension, and ultimately, discharge. See, e.g., Boston Sch. Comm. v. Service Employees, Int’l Union, Local 888, 71 Mass.App.Ct. 1126, 1126 n.2 (2008) (Memorandum and Order Pursuant Rule 1:28); Chief Justice for Adm. & Mgmt. of the Trial Court v. National Ass’n of Gov’t Employees/Service Employees Int’l Union, 69 Mass.App.Ct. 1102, 1104 (2007) (Memorandum and Order Pursuant to Rule 1:28). Progressive discipline policies are designed to correct employee misconduct by informing the employee of the consequences of such misconduct and imposing incremental discipline. Chief Justice for Adm. &Mgmt. of the Trial Court, 69 Mass.App.Ct. at 1104 n.3. These types of policies are flexible, however, to allow appropriate initial discipline for serious misconduct. Id.
If an agreement does not provide for progressive discipline, a determination by an arbitrator that progressive discipline is a necessary element of “just cause” is in excess of his authority. 48B Am.Jur.2d Labor and Labor Relations §2503. This court recognizes that “[i]n the collective bargaining context, the arbitrator is ordinarily empowered to interpret the underlying contract and the extent of his powers thereunder,” Geller, 435 Mass, at 229, however, as noted above, the arbitrator in this case did “not have any authority to change, modify or alter any provision of [the CBA]” nor did he have any authority “to impose any obligation upon the Sheriff unless clearly required by the application of an express provision of [the CBA].” Article 32, Section 4 of the CBA. See also AFSCME Council 93, Local 419, 67 Mass.App.Ct. at 706. By requiring the Department to provide advance written notice, the arbitrator added an additional requirement to the CBA that is akin to progressive discipline. While providing advance written notice may comport with the arbitrator’s own notions of fairness, it is a notion derived from a principle outside the contract itself.
Although the Court discerns no ambiguity in the CBA, even if there were some ambiguity for the arbitrator to interpret, an arbitrator’s interpretation must still stem in some way from the essence of the contract itself. There is nothing in the essence of the CBA that would allow the arbitrator to require advance written or verbal notice to an employee that his conduct could result in discharge.
The Department and ECCOA could have bargained for a progressive discipline policy and specifically chose not to include such a policy in Article 28 of the CBA, which relates to the discipline of employees. The CBA does, however, provide for progressive discipline relating to sick leave abuse by employees. That the CBA provides for progressive discipline in the article dealing with sick and other leave indicates a conscious decision by both parties to have progressive discipline apply in some contexts but not in others. The inclusion of a progressive discipline policy in Article 10, but not Article 28, also informs employees that in discipline matters not relating to sick time, they could be suspended or discharged without any verbal counseling or written warning for certain conduct.
Not only did the arbitrator modify the CBA by requiring advance written notice, the arbitrator’s decision effectively nullified Article 4 of the CBA. Article 4 gives the Department the right to decide whether, when, and how to exercise its rights and prerogatives, and specifically states that “the failure to exercise any right shall not be deemed a waiver.” By forcing the Department to provide advance notice that certain conduct could result in discharge, the arbitrator invalidated this no-waiver provision of the CBA. Thus, he exercised authority in direct contradiction to the text of the CBA. See School Comm, of Hanover v. Hanover Teachers Ass’n, 435 Mass. 736, 741 (2002). Since the award is expressly and directly contrary to the terms of the CBA, and the arbitrator went outside of the CBA to craft his award, the arbitrator exceeded his authority granted to him by the parties. AFSCME Council 93, Local 419, 67 Mass.App.Ct. at 707.
*492 2. Violation of Public Policy
“In determining whether arbitrators have exceeded their authority by directing a party to engage in conduct that allegedly is illegal, judicial review of the award is independent,’ Local 589, Amalgamated Transit Union, 392 Mass. at 411, which effectively means that judicial review is de novo, with no deference given to the arbitrators’ decision.” Adam Assoc., Inc., 22 Mass. L. Rptr. at 391. See also City of Somerville v. Somerville Man. Employees Ass’n, 418 Mass. 21, 25 (1994). When the issue is whether an arbitrator has directed a party to engage in illegal conduct, a court may not reasonably give any deference to the arbitrator’s decision for at least two reasons:
First if deference were given, a court may need to confirm an arbitration award even though it found that the award would require a party to violate the law. A court cannot reasonably be placed in the position of having to confirm an arbitration decision that mandates conduct in violation of prevailing law. Second, if a party acted in accordance with an arbitration award and thereby violated the law, he could not legally justify his illegal conduct by arguing that he acted in reliance on the arbitrators’ decision. An arbitrator cannot direct a person to act in violation of the law and thereby immunize that person from the consequences of his illegal conduct.
Adam Assoc., Inc., 22 Mass. L. Rptr. at 391. The question of public policy is ultimately one for resolution by the courts and not by an arbitrator. Boston Police Patrolmen’s Ass’n, 443 Mass. at 818; Bureau of Special Investigations v. Coalition of Pub. Safety, 430 Mass. 601, 603 (2001).
The court applies “a stringent, three-part analysis to establish whether the narrow public policy exception requires [the court] to vacate the arbitrator’s decisions.” Boston Police Patrolmen’s Ass’n, 443 Mass. at 818.
To meet the criteria for application of the public policy exception, the public policy in question must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests . . . The public policy exception does not address disfavored conduct in the abstract but [only] disfavored conduct which is integral to the performance of employment duties . . . Finally, we require a showing that the arbitrator’s award reinstating the employee violates public policy to such an extent that the employee’s conduct would have required dismissal.
City of Lynn, 435 Mass, at 62-63 (citations and internal quotations omitted) (emphasis in original). See also Boston Police Patrolmen’s Ass’n, 443 Mass, at 814 (vacating arbitration award reinstating a police officer because the officer’s “continued employment as a police officer would frustrate strong public policy against the kind of egregious dishonesty and abuse of official position in which he was proved to have engaged”).
As to the first factor, Massachusetts and the Department have a well-defined and dominant public policy against sexual and racial harassment. The public policy against harassment, both sexual and racial, is codified in G.L.c. 151B, §§4(1), 4(16A) (prohibiting both racial and sexual harassment in the workplace), and G.L.c. 214, §1C (right to freedom from sexual harassment). Additionally, the Department has its own anti-harassment policy, which is incorporated into the CBA and the policy includes the option to terminate for harassing behavior. Article 7 of the CBA, which deals with discrimination, states that “Employees found to have engaged in sexual harassment may be disciplined, up to and including discharge.” Additionally, G.L.c. 127, §12 calls for the removal by the commissioner of “[a]ny officer or employee in any correctional institution of the commonwealth who is unfaithful . . .” Public policy requires police and correctional officers to be truthful and obey the law in the performance of their official duties. Boston Police Patrolmen’s Ass’n, 443 Mass, at 823. Therefore, the first factor is satisfied.
As to the second factor, the Department argues that both Enos and Thompson held supervisory positions with the Department and their harassing and disruptive actions were integrally and directly linked to the performance of their job duties. ECCOA argues that the allegations of misconduct in this case involve off-duty behavior by Enos and Thompson and only in their capacity as union officers, not on-duiy conduct in their capacity as correctional officers. Massachusetts’ courts have found off-duty conduct can be integral to the performance of employment duties. See Boston v. Boston Police Patrolmen’s Ass’n, 74 Mass.App.Ct. 379 (2009). Furthermore, the Department has in place the following work rule, which governs off-duty conduct of employees: “Unlawful or improper conduct off the premises or during nonworking hours that affects the employee’s relationship to his/her job, fellow employees, Supervisors, or the Department’s service, property, reputation, or goodwill in the community is prohibited.” As supervisory employees, Enos and Thompson had an obligation to uphold the law and the Department’s policies and procedures. Their conduct of posting racially and sexually harassing posts about Sheriff Cousins and their co-workers and encouraging others to do so was integral to the performance of their employment duties.
As the Supreme Judicial Court opined in Boston Police Patrolmen’s Ass’n, “[p]eople will not trust the police . .. unless they are confident that police officers are genuine in their determination to uphold the law” and that police legitimacy would be undermined by the public’s knowledge that a police officer who vio *493 lated the law was reinstated. 443 Mass, at 823. The same is true for correction officers, Massachusetts Dept of Corr. v. Massachusetts Corr. Officers Federated Union, 23 Mass. L. Rptr. 160, 162 (Mass. Super. 2007) (Cratsley, J.). Such misconduct by Enos and Thompson “undermines the public’s faith in the integrity of our correction facilities in the Commonwealth” and undermines the ability of those employed in such institutions to rehabilitate inmates. Id. Therefore, I find the second factor is satisfied.
Finally, the Department has demonstrated that the arbitrator’s award reinstating Enos and Thompson violates public policy to such an extent that their conduct requires dismissal. As ECCOA correctly states, “(t]he question to be answered is not whether [the employee’s conduct] itself violates public policy, but whether the agreement to reinstate (the employee) does so.” Boston Police Patrolmen’s Ass’n, 443 Mass. at 819. The arbitrator found that Enos and Thompson had full control over the electronic bulletin board and their discharge was because they posted offensive and harassing messages on the board themselves, encouraged others to post such messages, and failed to remove, edit or take down the offensive messages. The finding by the arbitrator that “however . . . [neither] Enos and Thompson . . . knew or should have known that their conduct — or lack thereof — -would lead to their discharge” implicitly confirms the Department’s reasons for their termination. The arbitrator also found that many of the postings, “by any reasonable standard would be considered offensive, threatening, sexist and/or racist material.”
The arbitrator acknowledged and found that Enos and Thompson allowed postings about their boss, Sheriff Cousins, an African American, which stated that he should kill himself, he should be barbequed, and which called for his assassination. They also allowed statements to be posted that were racially harassing towards other coworkers; one posting called an African American employee a “house slave,” and commented that the Sheriff had to “marry a white woman [sic] nice trophy you think your [sic] better off with Ohara [sic] the sword s*****.” Deputy Kim O’Hara, was a female employee of the Department. Enos himself called Sheriff Cousins a “scumbag” and a “pimp” and both Enos and Thompson accused Sheriff Cousins of “playing the race card.” There were also a number of equally offensive sexually harassing comments.
That Enos and Thompson did not receive any prior written notice that their lack of monitoring and editing the electronic bulletin board could result in their discharge is not sufficient to override the public policy concerns in this case. This is especially true since the CBA contains no requirement of advance verbal or written notice. The character of the postings, both by Enos and Thompson themselves, and by others, not only violate the dominant public policy and laws against sexual and racial harassment, but they are egregiously offensive to any notion of human decency. “One of the most important police functions is to create and maintain a feeling of security of communities. To that end, it is extremely important for the police to gain and preserve public trust, maintain public confidence, and avoid an abuse of power by law enforcement officials.” Boston Police Patrolmen’s Ass’n, 443 Mass. at 819, quoting Clancy v. McCabe, 441 Mass. 311, 328 (2004) (Ireland, J., dissenting). This is equally applicable to corrections institutions and corrections officers. The image presented by corrections and police personnel to the general public permeates other aspects of the criminal justice system and impacts its overall success. Id. at 819-20, quoting Civil Serv. Comm’n v. Johnson, 653 N.W.2d 533, 538 (Iowa 2002) (quotations omitted). Two supervisory correctional officers who use their position to publicly post and encourage others to post offensive, threatening, sexist and racist material corrodes the public’s confidence in its correctional force and institutions. Indeed, such pernicious conduct by those responsible for the safe incarceration and rehabilitation of inmates tends to fray the very essence of our social compact.
Enos’s and Thompson’s conduct disrupted the operation of the Department, violated multiple rules and regulations of the Department, and endangered the safety of their co-workers and those in the custody of the Department. Their conduct required termination. Although arbitration decisions are given great deference, “they are not sacrosanct.” Boston Police Patrolmen's Ass'n, 443 Mass, at 823. In summary, the portion of the arbitrator’s award that reinstates Enos and Thompson to their former positions with full back-pay and benefits is in violation of an explicit, well-defined, and dominant public policy, and thus is in excess of his authority pursuant to G.L.c. 151C, §11(a)(3).
ORDER
For the foregoing reasons, it is hereby ordered that the Department’s Motion for Judgment on the Pleading is ALLOWED and the arbitrator’s award to reinstate Enos and Thompson is ordered VACATED and the Department’s termination decision is ordered REINSTATED.

 In a post on the electronic bulletin board dated April 4, 2006, Enos wrote, “I believe it is important to remember one of the reasons this site was created, and that was because the sheriff continually removed what he considered to be ‘objectionable postings’ from our union board at the jail.”

 The website’s user agreement states, ‘You agree not to post any abusive, obscene, vulgar, slanderous, hateful, threatening, sexually-oriented or any other material that may violate any applicable laws. Doing so may lead to you being immediately and permanently banned.”

 In March 1999, Sheriff Cousins discharged Lt. O’Leary based on O’Leary’s distribution of a racist and threatening e-mail to at least 10 individuals, some of whom were employees of the Department. The e-mail contained a full color photograph of Sheriff Cousins’s head and shoulders super *494 imposed with the cross-hairs of a rifle and the words “pull the trigger on the NIGGER!!!” (emphasis in original e-mail). The United States District Court upheld O’Leary’s discharge in 2004.

 The litigation before the MCAD is still pending and was scheduled for trial in October 2010.